COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Russell and AtLee
Argued at Fredericksburg, Virginia


JOSEPH LEON MATTHEWS

OPINION BY

v.      Record No. 1654-14-4      JUDGE ROBERT J. HUMPHREYS
NOVEMBER 3, 2015

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Benjamin N.A. Kendrick, Judge Designate[1]

Alexis M. Downing (King Downing PLC, on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Joseph Leon Matthews ("Matthews") appeals the ruling of the Circuit Court of Loudoun

County (the "circuit court") denying his motion to suppress the evidence that was recovered

pursuant to a traffic stop.  Matthews's single assignment of error asserts that the circuit court

erred in denying his motion to suppress because the officer's actions during the stop were not

reasonably related in scope to the circumstances that justified the seizure, and thus violated the

Fourth Amendment, which in turn invalidated his consent to search the vehicle.

I.  BACKGROUND

On June 11, 2013, Officer J. Mocello ("Officer Mocello") of the Leesburg Police

Department initiated a traffic stop of Matthews's vehicle based on an object dangling from the

rearview mirror, in violation of Code § 46.2-1054.[2]  When Officer Mocello approached the

vehicle, he asked Matthews for his license and registration.  Matthews gave him a paper learner's

---

[1] Judge Burke F. McCahill denied Matthew's motion to suppress the evidence.

[2] Appellant raises no issue with regard to the basis for the stop.

permit from Pennsylvania and a photo ID.  Officer Mocello then asked Matthews and the female passenger where they were going, how long they had been in Virginia, and where they lived in order to verify their addresses.  Matthews and the passenger responded that they were moving from Pennsylvania and staying at the passenger's parents' home.  Officer Mocello then asked Matthews if he had drugs or weapons in the car and if he had been arrested previously.  Officer Mocello testified that Matthews was "a little evasive and kept looking at his front passenger and became increasingly nervous.  That is when I asked him to step out of the car, and then we discussed his criminal history."  Matthews responded that he had been charged with evading and eluding police, reckless driving, and a third offense which Mocello could not recall when he testified at the suppression hearing.  Because the charges Matthews discussed were "dangerous," Officer Mocello had a heightened concern for his safety.

After Matthews stepped out of the car, Officer Mocello asked him some more questions related to the stop and engaged in "casual conversation."  Officer Mocello asked Matthews if his tattoos were "prison tattoos," which Matthews denied.  In total, the conversation about the tattoos lasted "roughly 20, 30 seconds."  Officer Mocello observed that Matthews's teeth were "dirty and yellowish," which he considered to be "consistent with a narcotics user."  Finally, Officer Mocello asked Matthews if his Pennsylvania learner's permit allowed him to drive outside of Pennsylvania.  Matthews responded that he was unsure whether he was permitted to drive outside of Pennsylvania.  Officer Mocello also questioned Matthews several times regarding him "being nervous" and why Matthews was shaking.  Matthews responded that he did not like police and had "bad nerves."

Approximately five minutes after the traffic stop began, Officer Mocello returned to the police cruiser.  First, Officer Mocello spent approximately one minute reviewing the documents Matthews had provided, noting they appeared to be legitimate and "state-issued."  Next, Officer

Mocello radioed his supervisor to request a K-9 unit for drug detection. After being switched to a different channel, his supervisor approved the K-9 en route. This request took approximately ten seconds. Officer Mocello requested the K-9 unit prior to calling into dispatch with the personal information obtained from Matthews because, based on his training and experience, he knew that he had "approximately twenty minutes" for the K-9 to arrive for him to be able to use the dog. Officer Mocello "wanted [to request a K-9 and call dispatch regarding Matthews's permit and ID] simultaneously, but [he] can't do two things at once."

Officer Mocello then gathered paperwork and looked up the relevant code section for the dangling object violation for approximately three minutes. Officer Mocello called dispatch and provided the personal information obtained from Matthews and the passenger. After searching Matthews's name through the database, dispatch reported that Matthews was "valid through Pennsylvania," but he "was not found" in Virginia.

Approximately four minutes later, Officer J. Zebrine ("Officer Zebrine"), who had been outside the vehicle with Matthews and the passenger while Officer Mocello was in the police cruiser, informed Officer Mocello that Matthews had consented to a search of his vehicle. At that time, Officer Mocello was still working on finishing the paperwork for issuing Matthews a warning for the dangling object violation. Upon learning of Matthews's consent to search his vehicle, Officer Mocello cancelled his request for a K-9 unit.

After completing the paperwork, Officer Mocello returned to Matthews's vehicle and advised that he did not believe Matthews was permitted to drive in Virginia on a learner's permit issued from another state. Then, the two men discussed how Matthews could obtain a Virginia driver's license. For approximately thirty seconds, Officer Mocello issued Matthews a warning for the dangling object and gave the learner's permit and ID back to Matthews. Officer Mocello again asked Matthews if there were any drugs or weapons in the car. Officer Mocello then

stated, "If you're going to let us search, we're not going to bring the dog." Matthews confirmed that he consented to the search of his vehicle.

Officer Zebrine could not recall the exact conversation he had with Matthews while Officer Mocello was in the police cruiser, but remembered discussing the fact that both he and Matthews were natives of Pennsylvania. At some point, Officer Zebrine asked Matthews if a K-9 unit would alert to his car. Matthews responded that a K-9 would not alert "[a]nd at that point, he said that [the officers] could go ahead and search the vehicle."

After a hearing, the circuit court denied Matthews's motion to suppress stating,

> [C]learly some of these questions are reasonably related to, at that point, officer safety and determining if anything was illegal in the car.
>
> And specifically, more apropos to what then developed after he produced the Pennsylvania learner's permit, whether it was a valid learner's permit and whether he could drive in the Commonwealth of Virginia, something this police officer candidly admits he didn't even know what [the] effect of it would be.
>
> *But clearly as the defense has argued, there were questions about prior arrests and the tattoos on the defendant's arms that really are not related to the purpose of the stop.*

(Emphasis added.)

The circuit court determined that the unrelated questions about Matthews's criminal history and tattoos "were given in fairly quick order" and the request for the K-9 unit lasted for a "very, very brief period" and "happened really almost contemporaneously with [Officer Mocello's] efforts to get information on the license." Concluding the officer was "entitled to a reasonable period" to execute the traffic stop, the circuit court found that the process was not unnecessarily delayed. The circuit court also found that Officer Zebrine obtained voluntary consent to search the car and held,

> I just find that . . . while there are elements in this particular case that can be raised as questions and raised as not pursuant to the

- 4 -

investigation, that the amount of delay is so *de minimus* . . . I don't think it really sufficiently rises to the point where the [c]ourt can find that there is a sufficient lack of diligence in pursuing this investigation such that I find that it is in any way attenuating the consent, nor do I find there was an unnecessary delay because consent was given.

## II. ANALYSIS

### A. Standard of Review

In reviewing a trial court's denial of a motion to suppress, "we determine whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." Roberts v. Commonwealth, 55 Va. App. 146, 150, 684 S.E.2d 824, 826 (2009). This Court is "bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*). "However, we consider *de novo* whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." Hughes v. Commonwealth, 31 Va. App. 447, 454, 524 S.E.2d 155, 159 (2000) (en banc) (citing McGee, 25 Va. App. at 198, 487 S.E.2d at 261).

### B. Consent to search

On appeal, Matthews argues that the police impermissibly prolonged the duration of the traffic stop to conduct an unrelated drug investigation in violation of the Fourth Amendment, which in turn invalidated his consent.

Our analysis begins with the general rule that "'a search authorized by consent is wholly valid.'" Kyer v. Commonwealth, 45 Va. App. 473, 483, 612 S.E.2d 213, 218 (2005) (*en banc*) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). "Consent loses its validity only

- 5 -

if it is involuntary, or is the product of a manipulative 'exploitation' by the police of an earlier unconstitutional search or seizure." Id. (citations omitted). Therefore, to determine whether Matthews's consent was the product of an unconstitutional seizure as he alleges, we must first determine whether Matthews was seized within the meaning of the Fourth Amendment at the time he gave his consent to search the vehicle.

A person is "seized" "only when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980). In contrast, police officers may engage in consensual encounters with citizens, so long as such encounters are those in which "a reasonable person would feel free 'to disregard the police and go about his business.'" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). The United States Supreme Court has identified several factors that may indicate that a seizure has occurred, including: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554.

In the present case, Matthews was in the presence of two armed and uniformed police officers throughout the encounter. Officer Mocello never advised Matthews he was free to leave. At some point while Officer Mocello was in the police cruiser finishing the paperwork for the traffic violation, Officer Zebrine asked Matthews if a K-9 unit would alert to his car. Matthews responded that a K-9 would not alert "[a]nd at that point, he said that [the officers] could go ahead and search the vehicle." Moments after concluding the business related to the traffic infraction, Officer Mocello again asked Matthews if there were any drugs or weapons in the car. Officer Mocello then stated, "If you're going to let us search, we're not going to bring the dog." Given the totality of the circumstances, we find that a reasonable person would not believe that

he was free to disregard the questions posed by Officers Zebrine and Mocello and simply drive away. See Harris v. Commonwealth, 266 Va. 28, 33, 581 S.E.2d 206, 210 (2003) (holding defendant was not free to leave when the "officer did nothing to indicate to [defendant] that he was no longer subject to detention for a traffic violation," and defendant remained in the presence of two armed, uniformed police officers and patrol vehicles with activated flashing lights).

Therefore, we hold that Matthews was seized for the purposes of the Fourth Amendment during his conversation with Officer Zebrine when he consented to the search of his vehicle and at the time Officer Mocello sought to confirm Matthews's consent to search the vehicle. Concluding Matthews was seized and his liberty restrained during the entire interaction with the officers, we next determine if such detention was justified under the Fourth Amendment.

Matthews contends that the traffic stop violated the Fourth Amendment and thus invalidated his consent because it was improperly prolonged by three actions: (1) the conversation regarding his arrest history and tattoos, (2) the request for a K-9 unit, and (3) Officer Mocello's request for Matthews's consent to search the vehicle after he had issued the written warning for the dangling object. The circuit court concluded the first two items amounted to a *de minimis* delay in executing the stop and implicitly found that because consent was obtained before Officer Mocello issued the warning to Matthews, the subsequent search did not unnecessarily delay the execution of the valid traffic stop. Our analysis of this issue is necessarily guided by the recent ruling of the United States Supreme Court in Rodriguez v. United States, 135 S. Ct. 1609 (2015).

## C. Impact of Rodriguez

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States,

517 U.S. 806, 810 (1996). A "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). The seizure remains lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).

Citing to both Caballes and Johnson, the Supreme Court made clear in Rodriguez that a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."[3] 135 S. Ct. at 1615. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." Id. at 1614. The Court went on to hold that a dog sniff that prolonged the traffic stop was impermissible because a dog sniff is "not fairly characterized as part of the officer's traffic mission" because it is not related to an inquiry into the traffic infraction at issue or officer safety. Id. at 1615-16.

In addition to asking relevant questions relating to the investigation into the dangling object violation, Officer Mocello also engaged in unrelated conduct which prolonged the stop including: inquiring into Matthews's criminal history, asking Matthews if his tattoos were "prison tattoos," and requesting a K-9 unit to conduct a dog sniff. Although the circuit court concluded that these actions resulted in only a *de minimus* delay in the completion of the traffic

---

[3] The Supreme Court acknowledged that its decision resolved the split that existed among lower courts regarding whether police officers "may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." Rodriguez, 135 S. Ct. at 1614 (comparing the Eighth Circuit case United States v. Morgan, 270 F.3d 625, 632 (8th Cir. 2001) (holding delay of "well under ten minutes" of post-completion delay was permissible), with Utah Supreme Court case State v. Baker, 229 P.3d 650, 658 (Utah 2010) (holding "without additional reasonable suspicion, the officer must allow the seized person to depart once the purpose of the stop has concluded")).

stop, the Supreme Court specifically rejected the "*de minimus*" line of cases, making it clear that "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a . . . ticket," and officers may not conduct unrelated investigations to prolong the traffic stop, absent independent reasonable suspicion ordinarily required to detain the individual. Id. at 1614-15.

Accordingly, the seizure of Matthews and subsequent search of the vehicle was improper, unless Officer Mocello's unrelated questions and conduct can be supported by independent reasonable suspicion or probable cause.

Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), "[i]f a police officer has reasonable, articulable suspicion that a person is engaging in, or is about to engage in, criminal activity, the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." McGee, 25 Va. App. at 202, 487 S.E.2d at 263. When a court reviews whether an officer had reasonable suspicion to temporarily detain a person, it must view the totality of the circumstances and view those facts objectively through the eyes of a reasonable police officer with the knowledge, training, and experience of the investigating officer. Murphy v. Commonwealth, 9 Va. App. 139, 144, 384 S.E.2d 125, 128 (1989).

Applying the above standards, and in consideration of all the circumstances then present, we conclude that Officer Mocello did not have a reasonable articulable suspicion that Matthews possessed illegal drugs to justify the extension of the stop by inquiring into his criminal record, discussing his tattoos, and requesting a K-9 unit. The record in the light most favorable to the Commonwealth indicates that Matthews was "a little evasive and kept looking at his front passenger and became increasingly nervous," had been previously charged with evading and eluding police, third offense reckless driving, and had teeth that were "dirty and yellowish,"

- 9 -

which Officer Mocello considered to be "consistent with a narcotics user." Because these facts alone are insufficient to rise to the level of either reasonable articulable suspicion or probable cause that Mathews was engaged in criminal activity, Officer Mocello was not justified in detaining Matthews beyond the completion of the traffic infraction investigation.

We conclude that pursuant to Harris, Matthews was detained at the time he gave his consent to search to Officer Zebrine and when Officer Mocello subsequently confirmed Matthews's consent. Therefore, applying Rodriguez to the facts of this case, we hold that because Matthews's detention exceeded the time reasonably necessary to address the dangling object traffic violation, the seizure violated the Fourth Amendment and consequently invalidated Matthews's consent to the search. See Florida v. Royer, 460 U.S. 491, 507-08 (1983) (holding that because defendant was illegally detained when he consented to the search, his "consent was tainted by the illegality and was ineffective to justify the search").

However, our analysis does not end there. Before determining whether the evidence resulting from the seizure should have been suppressed, we must consider whether the officers complied with the parameters of the law as it existed at the time of the traffic stop.

### D. Application of the Exclusionary Rule

Conceding that the stop was impermissibly extended under the Supreme Court's recent ruling in Rodriguez, the Commonwealth argues that the exclusionary rule should not apply.[4] Specifically, the Commonwealth asserts that the purpose of the exclusionary rule, which is to deter future police misconduct, is not served because the police officers in this case were following the law as it existed at the time of the stop. We agree.

---

[4] We are not bound by concessions of law by the parties. Hodges v. Commonwealth, 64 Va. App. 687, 699, 771 S.E.2d 693, 699 (2015) (citation omitted). However, for the reasons stated above, the Commonwealth is correct that the stop impermissibly was extended under the rule announced in Rodriguez.

- 10 -

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144 (2009). In Davis v. United States, 131 S. Ct. 2419 (2011), the Supreme Court extended this principle to instances where the law changed after the time of the search, holding that evidence obtained during a search conducted in reasonable reliance on binding precedent at the time is not subject to the exclusionary rule. Id. at 2429. The Court explained that all exclusion would serve to do in such a situation is to punish "conscientious police work" because "[r]esponsible law-enforcement officers will take care to learn 'what is required of them' under Fourth Amendment precedent and will conform their conduct to these rules." Id. (quoting Hudson v. Michigan, 547 U.S. 586, 599 (2006)). "[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities" and thus an "officer who conducts a search in reliance on binding appellate precedent does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances." Id. (quoting United States v. Leon, 468 U.S. 897, 920 (1987)) (internal quotations omitted). Therefore, the deterrent effect of exclusion in such a case can only be to discourage the officer from performing his duty. Id. The Court summarized, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this [context]." Id.

At the time of the stop in this case, binding precedent established that a *de minimis* delay in the completion of a traffic stop to conduct an investigation unrelated to the purpose of the stop did not violate the Fourth Amendment's prohibition against unlawful seizures.

The United States Supreme Court held in 2009 that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other

- 11 -

than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration."

Johnson, 555 U.S. at 325 (citing Muehler v. Mena, 544 U.S. 93, 100-01 (2005)).  Citing Johnson,

the Fourth Circuit held,

> There is no support in Fourth Amendment jurisprudence for the
> notion that questioning unrelated to the purpose of a traffic stop
> requires reasonable suspicion, provided that the questioning occurs
> within the timeframe reasonably necessary to effectuate the traffic
> stop.  An officer's questions or actions during the course of a
> traffic stop or any other legal detention need not be solely and
> exclusively focused on the purpose of that detention.

United States v. Mason, 628 F.3d 123, 131 (4th Cir. 2010).  The Mason court noted that the

officer executed the stop efficiently, examining the papers, calling dispatch to relay information,

testing the tinted windows, and issuing a warning ticket within eleven minutes, and concluded

that the "one to two of the [eleven] minutes devoted to questioning on matters not directly related

to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern."  Id.

at 132 (citing United States v. Farrior, 535 F.3d 210, 220 (4th Cir. 2008) (holding that *de minimis*

delays in conducting a traffic stop do not violate the Fourth Amendment); United States v.

Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006) ("'[A] two minute delay . . . is a *de minimis*

intrusion on the driver's personal liberty that does not violate the Fourth Amendment'" (quoting

United States v. Martin, 411 F.3d 998, 1002 (8th Cir. 2005))); United States v. Purcell, 236 F.3d

1274, 1279 (11th Cir. 2001) (three-minute delay was *de minimis* and did not violate the Fourth

Amendment)).

Although now implicitly overruled by Rodriguez, this Court had similarly held "a police

officer with 'probable cause' to detain a suspect for the issuance of a traffic summons does not

convert the lawful encounter into an unreasonably long, unlawful seizure simply by asking a few

brief questions 'related to possible drug trafficking amidst his other traffic-related inquiries and

tasks.'"  Ellis v. Commonwealth, 52 Va. App. 220, 227, 662 S.E.2d 640, 643 (2008) (quoting

United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007)). This Court explained that a *de minimis* delay, caused by one minute of questioning about drugs, which was unrelated to the specific reason for the detention, does not invalidate a later, voluntary consent to search. Id. at 226-28, 662 S.E.2d at 643-44.

In Ellis, the police officer stopped the defendant for an inoperative brake light, obtained the defendant's driver's license, informed her of the reason for the stop and returned to his police cruiser to verify the defendant's information. Id. at 223, 662 S.E.2d at 641. While waiting for dispatch to verify defendant's information, the officer recalled that Ellis had a previous narcotics history, so he asked Ellis if she would consent to a search of her vehicle. Id. Ellis refused and the officer asked if he needed to request a canine, to which Ellis replied that he could go ahead and get the drug dog. Id. The officer made the request for the dog, and when the dog arrived shortly thereafter, it alerted to the presence of drugs in Ellis's vehicle. Id. at 223-24, 662 S.E.2d at 641-42. At that point, Ellis consented to a search of her person. Id. at 224, 662 S.E.2d at 642.

Similar to the officers in Ellis, Officer Mocello engaged in a brief conversation with Matthews about his criminal history and tattoos, which were unrelated to the stop. Like Matthews, the defendant in Ellis consented to a search while she was lawfully detained by an officer who had probable cause to issue a citation for a traffic violation. Id. at 228, 662 S.E.2d at 644. Therefore, consistent with the factual findings of the circuit court and binding precedent at the time, we find that the unrelated questions about Matthews's criminal history and tattoos that "were given in fairly quick order" and the request for the K-9 unit lasted for a "very, very brief period" and "happened really almost contemporaneously with [Officer Mocello's] efforts to get information on the license," and thus did not measurably extend the traffic stop.

Secondly, Matthews argues that his consent was invalid because his consent was given after the traffic stop was completed. However, this argument ignores the fact that Matthews had

- 13 -

given Officer Zebrine consent to search the vehicle while Officer Mocello was still completing paperwork relating to the traffic infraction, which the officers could reasonably conclude, also operated as consent for an extension of the stop in order for the officers to conduct the search of the vehicle.

In contrast to this case, the search in Ellis which was also based on consent, was executed *prior* to the officer completing the paperwork and issuing the traffic summons. Id. Therefore, the case at bar presents a unique situation where the justification for the stop (a dangling object violation) existed from the beginning of the stop up until the moment of consent to Officer Zebrine—the only constitutional wrinkle being that Officer Mocello chose to later confirm Matthews's consent and execute the search after issuing the traffic citation.

While there was no binding precedent directly on point at the time of the stop, there was an unreported case from the Fourth Circuit that is instructive. In United States v. Davis, 460 F. App'x 226, 232 (4th Cir. 2011), the Fourth Circuit held that a brief exchange that was unrelated to the purpose of the traffic stop did not extend the scope and duration of the stop in a manner that would render the stop unconstitutional. The court also noted that because the officer had not issued the citation, he had "not yet effectuated the purpose of the stop," and the defendant was still lawfully detained. Id. at 231. Further, concluding the defendant's consent to search was "voluntary and provided during a lawful detention," it was valid and also operated as consent "to an extension of the traffic stop long enough for the officers to conduct the search." Id.

The Eighth Circuit had similarly found no Fourth Amendment violation occurred where at the time the officer requested consent to search the defendant's vehicle, he had not run a check on defendant's license or issued a written citation for the traffic violation, "so the legitimate purposes for the stop had not yet ceased." United States v. Long, 532 F.3d 791, 795-96 (8th Cir.

- 14 -

2008); see also United States v. Nassar, 546 F.3d 569, 570 (8th Cir. 2008) (relying on Long, upheld a search because the officer was still processing the traffic warning at the time he obtained the defendant's consent to search the vehicle, noting "the detention to that point was supported by the facts that justified its initiation").

Matthews provided his consent to search his vehicle to Officer Zebrine while Officer Mocello was still in the process of writing the warning for the dangling object violation.  Further, there is no evidence in the record, nor does Matthews claim, that his consent was coerced in any way or subsequently revoked.  As such, Matthews was lawfully detained based on probable cause that he had committed a traffic infraction at the time he provided his consent.  Accordingly, pre-Rodríguez, and under the circumstances present here, Matthews's consent to search his vehicle also operated as consent to an extension of the traffic stop long enough for the officers to conduct the search.  Thus, based upon the jurisprudence at the time of the traffic stop, the duration and scope of the detention in this case does not trigger the application of the exclusionary rule.

Matthews relies on a Fourth Circuit case and an unpublished opinion from this Court to support his argument for reversal.  However, both are easily distinguishable from the case at bar.  In United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), after initiating a lawful traffic stop, the officer "'definitely abandoned the prosecution of the traffic stop and embarked on a sustained investigation' into the presence of drugs, instead of either completing the warning ticket or beginning the driver's license check."  Id. at 509-10 (quoting United States v. Everett, 601 F.3d 484, 495 (6th Cir. 2010)).  The court also noted "the record, in particular the video, makes clear that at just about every turn [the officer] was conducting a drug investigation instead of a traffic infraction investigation."  Id. at 510.  The Fourth Circuit distinguished Digiovanni from Mason, and held that such delay was not de minimis.

In the unpublished case from this Court, Commonwealth v. Ramsdell, Record No. 2925-06-3, 2007 Va. App. LEXIS 166 (Va. Ct. App. Apr. 20, 2007), the officers initiated a lawful stop and obtained the driver's license of the defendant, "but took no further steps to complete the traffic stop." Id. at *8. In that case, the officers did not inform defendant of the reason for the stop, did not conduct a check on defendant's license, and failed to take any action towards issuing a ticket for the traffic offense. Id. at *8-9. In fact, this Court found that the officers in Ramsdell were "solely focused on their narcotics investigation." Id. at *9.

Unlike the officers in Digiovanni and Ramsdell, Officer Mocello pursued the purpose of the traffic stop. The circuit court made findings of fact that the unrelated questions "were given in fairly quick order" and the request for the K-9 unit lasted for a "very, very brief period" and the "whole process [was] just a matter of minutes." In contrast to the officers in Digiovanni and Ramsdell, Officer Mocello spent the majority of the time during the stop reviewing the documents Matthews had provided, calling into dispatch, gathering paperwork, reviewing the code section for the dangling object violation, and preparing the written warning.

The officers in this case complied with the law at the time of the traffic stop, as articulated in Ellis and Mason. Under exclusionary-rule precedents, the absence of police culpability defeats Matthews's claim for suppression. The purpose of the rule would not be furthered by requiring clairvoyance on the part of police officers to predict how the law may change in the future. Therefore, even though the police conduct here would be improper under the recent Rodriguez decision, the exclusionary rule does not apply and we therefore hold that the evidence should not be suppressed.

## III. CONCLUSION

Pursuant to the recent United States Supreme Court decision in Rodriguez, we hold that Officer Mocello's delay in completing the traffic stop violated the Fourth Amendment and

- 16 -

consequently invalidated Matthews's consent to search the vehicle. However, because the officers acted in good faith and consistent with the law in existence at the time of the stop, we hold that the exclusionary rule does not apply and the evidence obtained from the seizure should not be suppressed. Accordingly, we affirm the circuit court's judgment.

<u>Affirmed.</u>