UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Decker, AtLee and Malveaux
Argued at Richmond, Virginia


SHAYQUAN QUANTAE MARSHALL

MEMORANDUM OPINION[*] BY
v.        Record No. 2053-15-2             JUDGE RICHARD Y. ATLEE, JR.
                                           DECEMBER 6, 2016
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Beverly W. Snukals, Judge

David B. Hargett (Hargett Law, PLC, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


The Circuit Court of the City of Richmond ("trial court") convicted appellant Shayquan

Quantae Marshall for possession of cocaine with the intent to distribute, third or subsequent

offense. On appeal, he contends the trial court erred in denying his motion to suppress because

the officer unlawfully deviated from the stop in calling and assisting a K9 unit. For the

following reasons, we find no error in the result and affirm.

I. BACKGROUND

"On appellate review, we are bound by the familiar principle that 'we must consider the

evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to

the Commonwealth, the prevailing party below.'" Collins v. Commonwealth, 65 Va. App. 37,

40, 773 S.E.2d 618, 620 (2015) (quoting Robinson v. Commonwealth, 273 Va. 26, 30, 639

S.E.2d 217, 219 (2007)), aff'd, ___ Va. ___, 790 S.E.2d 611 (2016). So viewed, the evidence

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

reflects that on July 22, 2014 at approximately 11:30 a.m., Detective Milton was patrolling an area "known for having a lot of street-level narcotics." A vehicle, driven by Marshall, cut in front of him. Milton pulled Marshall's vehicle over for that traffic violation and for a dangling object hanging from his rearview mirror. Detective Melton, who recognized Marshall from prior drug arrests, happened to be nearby and witnessed the stop. Immediately after Milton stepped away from Marshall's vehicle to return to the patrol car, Melton, who was still in his patrol car, advised Milton of Marshall's criminal history. He mentioned that Marshall likely had narcotics on his person, and recommended that Milton call a K9 unit. Milton radioed for a K9 unit as he returned to his patrol vehicle. In the patrol car, he began checking the information he had collected from Marshall. Consistent with the information Melton had provided, Marshall's "PISTOL"[1] background check indicated that he was a "narcotics seller, user, probably armed, a gang member."

Officer Robinson arrived at the scene with her drug-detection dog within five minutes of Milton calling for a K9 unit. At the time Robinson was dispatched at 11:37 a.m.,[2] she was a mile away. She left the station at approximately 11:39 a.m. When she arrived, Milton had not yet finished investigating the traffic infraction. She spoke with Milton for approximately[3] a "couple of minutes" in order to determine where Milton wanted her to run the dog. She removed the dog from the vehicle and it "immediately" alerted on the driver's side of the vehicle, where Marshall

---

[1] "PISTOL" is a database that advises officers of the "nature of the contact" a suspect has had with the Richmond Police Department, any prior arrests, and whether the suspect might be armed.

[2] Robinson testified she did not know what time the request was received; she only knew the time she was dispatched to the scene. However, Robinson's testimony regarding the time she was dispatched is consistent with Milton's recollection that she arrived no more than five minutes after he requested a K9 unit.

[3] On cross-examination, Robinson stated that she spoke with the officer at the scene for a "couple of minutes," "[g]ive or take a minute or two minutes."

was seated with the window open. The alert occurred at 11:44 a.m. After the alert, Marshall admitted he had drugs on his person. Later, police found a clear plastic bag sewn into the fly of his shorts. The bag contained multiple individually-wrapped portions of a substance later determined to be crack cocaine.

## II. ANALYSIS

For Fourth Amendment purposes, Marshall was seized throughout the duration of the stop. "A 'seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" Matthews v. Commonwealth, 65 Va. App. 334, 344, 778 S.E.2d 122, 127 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Id. (alteration in original) (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)). Marshall argues that Milton deviated from the traffic stop in three instances and that those deviations unlawfully prolonged the stop: (1) Milton's and Melton's conversation about Marshall's criminal history, (2) the delay attributed to Milton calling for a K9 unit, and (3) Milton's conversation with Robinson upon her arrival.

The stop here occurred prior to the United States Supreme Court decision in Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015) (holding that during a lawful traffic stop, a police officer "may conduct certain unrelated checks," but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"). At the time of the stop in this case, binding precedent stated that there was no Fourth Amendment violation if any deviations or delays unrelated to the traffic stop were "*de minimis*." Matthews, 65 Va. App. at 353, 778 S.E.2d at 132; Ellis v. Commonwealth, 52 Va. App. 220, 227, 662 S.E.2d 640, 643 (2008). Evidence obtained during a search conducted in reasonable

- 3 -

reliance on binding precedent at the time is not subject to the exclusionary rule. Davis v. United States, 564 U.S. 229, 241 (2011) (describing this dimension of the "good faith" exception). Therefore, we may assume without deciding that any delay here was unlawful under Rodriguez, but nevertheless, the evidence should not be excluded so long as the delays unrelated to the traffic offense were "*de minimis*."[4]

Whether the delays were *de minimis* presents "a mixed question of law and fact that we review de novo on appeal." McCain v. Commonwealth, 275 Va. 546, 551, 659 S.E.2d 512, 515 (2008). We are "bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Matthews, 65 Va. App. at 341-42, 778 S.E.2d at 126 (quoting McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*)). After considering each alleged deviation individually, and then in their totality, we find that any extension of the stop caused by Milton's investigation of a suspected drug offense was only a *de minimis* delay. Thus, the evidence was admissible under the good faith exception to the exclusionary rule.

A. *Milton's conversation with Melton*

The record is silent as to the exact amount of time that Milton and Melton spoke. The trial court noted that either "just sort of in passing [Melton] yelled out to him" or "there was some discussion as [Milton] was travelling to the squad car." In either scenario, the conversation was limited in scope and duration. It also coincided with Milton's return to his patrol vehicle,

---

[4] The trial court denied the motion to suppress because it found the stop lawful under Rodriguez. We affirm the judgment not for that reason, but because this stop occurred prior to the Rodriguez decision and was lawful under then-existing law. Thus, the exclusionary rule does not apply. Debroux v. Commonwealth, 32 Va. App. 364, 371, 528 S.E.2d 151, 154 (2000) ("an appellate court may affirm the judgment of a trial court when it has reached the right result" for a reason other than the reason adopted by the appellate court (quoting Driscoll v. Commonwealth, 14 Va. App. 449, 452, 417 S.E.2d 312, 313 (1992))).

which was part of the traffic stop.  Furthermore, such a conversation advances the interest of protecting officer safety, given that Melton had prior experience with Marshall, and Marshall's PISTOL profile indicated he was "probably armed" and "a gang member."  Ultimately, characterizing this conversation as akin to Milton checking Marshall's criminal history, the trial court ruled that the initial conversation with Melton was not a "deviation" from the traffic stop. We agree.

### B.  *Milton calling a K9 unit*

Second, Marshall challenges the delay caused by Milton's call for a K9 unit.  Viewing the evidence in the light most favorable to the Commonwealth, Milton had already placed the call before he returned to his patrol vehicle to run Marshall's information.  Because he needed to return to the patrol car as part of the investigation into the traffic offense, the most reasonable inference, viewing the evidence as we must, is that his placing this call *en route* did not result in any measurable delay.

### C.  *Milton speaking with Robinson*

Third, Marhsall contends the traffic stop was interrupted when Milton got out of his vehicle and spoke with the K9 officer, Robinson, upon her arrival.  The trial court ruled that there was "no evidence" that the time it took Robinson to arrive and speak with Milton "delayed Milton in any way or that that didn't coincide with the reasonable time that Milton took to do his traffic investigation."  We cannot say this factual finding is plainly wrong or unsupported by the evidence.  Furthermore, Robinson testified that this conversation was quite limited in scope — confined solely to determining where Milton wanted her to run the dog.  Viewing the evidence in the light most favorable to the Commonwealth, the conversation was at most two minutes long.

D. *The alleged deviations as a whole*

Even if each alleged deviation, by itself, was *de minimis*, we must consider their collective effect on the duration of the stop. Milton stopped Marshall at approximately 11:30 a.m. The record does not specify exactly how long Milton spoke with Melton, but shortly after the exchange, Milton called for a drug dog. Robinson was contacted by dispatch at 11:37 a.m. She left from a police station approximately one mile away at roughly 11:39 a.m. When she arrived shortly thereafter, Milton had nearly finished checking Marshall's information for the traffic offense. Robinson spoke with Milton briefly "to find out what they want me to run," which she estimated lasted a minute or two. She then removed her dog from her vehicle. The dog "immediately" alerted to the vehicle at 11:44 a.m. The investigation into the traffic offense had not concluded before the dog alerted.

In sum, over the course of an approximate fourteen-minute period between the beginning of the stop and the dog alerting, at most two to three minutes were attributable to investigating the suspected narcotics offense. Although no binding case law presents these precise facts, persuasive guidance indicates that this is a *de minimis* intrusion. See United States v. Mason, 628 F.3d 123, 132 (4th Cir. 2010) (finding that "one to two of the 11 minutes devoted to questioning on matters not directly related to the traffic stop constituted only a slight delay that raises no Fourth Amendment concern"); United States v. Alexander, 448 F.3d 1014, 1017 (8th Cir. 2006) (upholding four-minute extension of a twenty-minute stop); United States v. Martin, 411 F.3d 998, 1002 (8th Cir. 2005) (stating that a "two minute delay . . . is a *de minimis* intrusion on the driver's personal liberty that does not violate the Fourth Amendment"); United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir. 2001) (affirming a three-minute delay during fourteen-minute stop as *de minimis*).

In <u>Matthews</u>, this Court addressed an analogous set of facts. During the course of a traffic stop, the officer asked Matthews questions unrelated to the traffic offense, on topics such as his travel history, criminal background, and whether his tattoos were "prison tattoos." The officer also questioned Matthews about drug use and why he appeared nervous. After taking Matthews's information, the officer returned to his cruiser to check it and to call a K9 unit. The officer spent only "twenty to thirty seconds" speaking with Matthews about his prison tattoos, and only about "ten seconds" calling the drug dog. We did not tally the total time devoted to "non-traffic citation" deviations out of the total duration of the stop, but emphasized that the "unrelated questions 'were given in fairly quick order'" and that "the 'whole process [was] just a matter of minutes.'" <u>Matthews</u>, 65 Va. App. at 353, 778 S.E.2d at 132. We concluded that the deviations were unlawful under <u>Rodriguez</u>, but were *de minimis*, and therefore lawful, prior to <u>Rodriguez</u>. Accordingly, the exclusionary rule did not apply. <u>Id.</u>

The delays here are similar to those in <u>Matthews</u>, consisting of two brief conversations and a request for a K9 unit. Viewing the evidence in the light most favorable to the Commonwealth, these delays amounted to, at most, two to three minutes. Accordingly, because "the 'whole process [was] just a matter of minutes,'" <u>id.</u>, the deviations from the total length of the traffic stop were *de minimis*. Because the search was lawful under the prevailing law of the time, the exclusionary rule does not apply, and the trial court did not err in denying Marshall's motion to suppress.

### III. CONCLUSION

The trial court did not err in denying Marshall's motion to suppress, because any deviation from the traffic stop was *de minimis*, and thus falls within the good faith exception to the exclusionary rule. Accordingly, we affirm Marshall's conviction.

<u>Affirmed</u>.