COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Friedman and Raphael
Argued at Lexington, Virginia


TRAVIS WAYNE HYPES, II

                              MEMORANDUM OPINION[*] BY
v.      Record No. 1227-21-3        JUDGE STUART A. RAPHAEL
                                    SEPTEMBER 6, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PULASKI COUNTY
Bradley W. Finch, Judge

Kimberly D. Sharp (Office of the Public Defender, on briefs), for
appellant.

Leanna C. Minix, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Travis Wayne Hypes, II, appeals his convictions for possessing a firearm as a previously

convicted felon and for possessing a Schedule I or II controlled substance (methamphetamine).

Hypes challenges the sufficiency of the evidence. He also claims that the firearm and

methamphetamine found in the farm vehicle he was driving were the fruits of an illegal search.

He argues that the officer who stopped him for a traffic violation prolonged the stop to call in the

drug-sniffing dog that alerted to the narcotics in the vehicle. But we find no error in the trial

court's conclusion that the officer did not prolong the stop. And we find that the evidence

sufficed to support the convictions. So we affirm the judgment below.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

On June 9, 2019, at about 12:15 a.m., Pulaski County Sheriff's Deputy Ethan Hodge was driving along a public highway in his marked vehicle when he saw a truck with farm-use tags make two lane changes, without signaling, to pass another vehicle. Hypes was driving the truck. Hodge activated his emergency lights, but Hypes did not stop. Instead, Hypes slowed down, turned right, and continued about another quarter mile before stopping at a dead end. Hodge estimated that the truck had traveled a half mile before stopping.

Hodge radioed his office when he began the pursuit. That was at 12:20 a.m., according to the computer-aided dispatch (CAD) report. He did not contact his office when Hypes came to a stop, but Hodge estimated that that was "a couple minutes" later, around 12:22 or 12:23 a.m.

Hodge approached the vehicle and spoke with Hypes. An adult female sat in the passenger seat. At Hodge's request, Hypes presented his Virginia driver's license. When asked why he had taken so long to stop, Hypes said his windshield was fogged up and that he was turning off the roadway to clear it up. Hypes also said that he was driving to Walmart to purchase chicken feed. Hypes could not produce the vehicle's registration.

Hodge returned to his police vehicle to check Hypes's identification and to run a check on the truck's vehicle identification number (VIN). The dispatch center reported that Hypes's license had been suspended but that Hypes had not been notified of the suspension. It took longer to receive a response about the VIN. While he waited, Hodge told Hypes that his license had been suspended. Hodge asked if there were any illegal items in the truck, such as "narcotics" or "firearms," and he requested permission to search the vehicle. Hypes did not consent. He said that he was calling his lawyer and picked up his phone.

- 2 -

Hodge then returned to his vehicle to wait for the VIN information. While waiting, Hodge called for police backup and a K-9 unit. Hodge testified that he called for the K-9 unit "[b]ased on [Hypes's] defensiveness and basically just my right to do so."

Hodge received the VIN information around 12:28 a.m., at which point he started to prepare the summons for the improper-lane-change citation and the notice of suspension of Hypes's license. *See* Code § 46.2-416. Hodge's attention at first was divided between preparing the paperwork and watching Hypes and his passenger. But then Sergeant Owens arrived at 12:30 a.m., allowing Hodge to focus his full attention on the paperwork.

There was some dispute about when the K-9 unit arrived. The K-9 unit consisted of then-Corporal Chris Giampocaro and his drug-sniffing dog, Zeus. The CAD report showed that Giampocaro was dispatched to the scene at the same time he arrived, 12:41 a.m. But Giampocaro testified that he was one-and-a-half to two miles away when he received the call, so the CAD report was not accurate. Because Hodge was still preparing the summons and suspension notice, he did not realize that Giampocaro had arrived until he walked up to Hodge's vehicle.

According to the CAD report, the difference in time from when Hodge received the VIN information and Giampocaro's arrival was about twelve-and-a-half minutes. Hodge said that that was about how long it would usually take him to prepare the summons and the notice of suspension. He added there were "some extensive circumstances" here that made it take longer. For instance, he did not have a paper copy of the truck's registration; he had to refer to his computer instead, which "takes a little bit longer." On cross-examination, Hodge said that he needed the VIN for the summons and to check whether the truck was stolen, but he later admitted that he "did not need the VIN" and had not written it on the summons.

When Giampocaro arrived and spoke to Hodge, a conversation that lasted fifteen to thirty seconds, Hodge asked him to deploy Zeus, and Giampocaro agreed. At that point, Hodge was still preparing the summons and notice of suspension, so he did not track how long the dog sniff took. Hodge testified that he did not purposefully delay in writing the summons or the notice of suspension.

Giampocaro testified that Zeus took two passes around the vehicle and responded with a "positive alert." Giampocaro estimated that the time between his arrival and Zeus's alerts was a "[l]ittle over five minutes." In the meantime, Hodge completed the summons and the suspension notice. He testified that it took him "[a]t least thirteen" minutes to do so.

After Hodge presented the paperwork to Hypes and asked him to sign it, Giampocaro told Hodge that Zeus had alerted on the vehicle, prompting the officers to search the truck. Under the front passenger seat, they found a Ruger 9mm handgun and a glass pipe for smoking methamphetamine. In the backseat, they found a bag containing drug paraphernalia. The bag held a metal container monogrammed with Hypes's initials—"TWH II." Inside that container were measuring scales and a black bowl used for weighing substances. The black bowl contained a residue that a laboratory analysis identified as methamphetamine.

When Hodge asked who owned the gun, Hypes answered that it was *not* his passenger's. Hypes said he "had been recently jumped and was carrying the firearm for protection." When asked about the monogrammed metal container, Hypes responded that "he had cleaned out his residence and . . . was throwing those items away."

Hypes testified in support of the motion to suppress.[1] He claimed that after he provided his driver's license, Hodge went back to his vehicle. Hypes did not know how long Hodge

---

[1] The trial court heard all the evidence from the Commonwealth at once, both for the motion to suppress and the trial; then the defense presented evidence on the motion to suppress.

stayed there. Hypes said that, when he returned, Hodge said he was giving him a summons for an illegal lane change and a written notification of license suspension. Hypes said that Hodge was about to hand him the summons, but Hodge pulled the papers back when Sergeant Owens arrived. Hypes didn't remember how long it took for the K-9 unit to arrive, but it was "a pretty good bit"—longer than five minutes. Hypes said he knew it was longer than five minutes because he called his mother and that call took thirty-five minutes.

The trial court denied the suppression motion, finding that Hodge had not prolonged the stop to enable the dog sniff. In explaining its ruling, the court noted that:

- The CAD report was inaccurate, at least in part, about the times of certain events.

- Deputy Hodge began the traffic stop around 12:20 a.m.

- A "significant period" of time elapsed, at least a few minutes, before Hypes brought the truck to a stop. The court determined that the truck came to a stop at 12:23 a.m.

- Hodge proceeded to speak with the truck's occupants, obtained information, checked the VIN with dispatch and, in the meantime, called for the K-9 officer.

- K-9 officer Giampocaro arrived at about 12:41 a.m.

- The time it would take Hodge to prepare the summons and notice of suspension was at least as long as the time between when Hypes stopped the truck and the K-9 unit arrived at the scene.

- Zeus alerted on the truck about five minutes after arriving on the scene.

- The dog sniff was completed while Hodge was still preparing the summons and license-suspension notice.

---

The court denied the motion to suppress and, based on that decision, the defense proceeded with a motion to strike, followed by the defense's case in chief.

After the trial court overruled Hypes's motion to strike the Commonwealth's case-in-chief evidence, the defense called Hypes's mother. She testified that she had a concealed-carry permit and that the gun was hers. She said that she had ridden as a passenger in the truck and that she always put the gun under the seat.

Hypes returned to the witness stand. He testified that the truck was his employer's, he didn't know the gun was in the truck, and the gun was not his. Hypes claimed that the officers had misunderstood him. He meant that his mother and a previous co-worker were the ones who had been jumped and that they had the firearm for self-defense. Hypes also denied knowing that there was an "item in the backseat with narcotics on it." He claimed that he was getting rid of things in the bag that belonged to his former roommates. He denied telling the officers that the items were his. But when asked if he knew that anything in the bag was illegal, he said that he knew what the "scales and stuff" were "for, yes, but I did not know that it had residue on it, that's why I wanted to get it out of my house, because the house is in my name and I didn't wanna be in trouble if something were to happen later on."

The trial court denied the renewed motion to strike and found Hypes guilty of possessing methamphetamine and possessing a firearm after having been convicted of a felony. The trial court found the testimony by Hodge and Giampocaro to be "very credible." By contrast, the court found the testimony by Hypes and his mother to be "very lacking in credibility." The court sentenced Hypes to five years' incarceration on each of the two charges, suspending seven years and three months, for an active sentence of two years and nine months.

ANALYSIS

On appeal, Hypes argues that the trial court erred in failing to suppress the narcotics and firearm evidence and that the evidence, in any case, was insufficient to support his convictions for unlawful possession. We are not persuaded.

*A. The trial court did not err in denying the motion to suppress.*

When reviewing the denial of a motion to suppress the evidence based on an alleged Fourth Amendment violation, "we defer to the trial court's 'findings of historical fact,' taking care to review them 'only for clear error and to give due weight to inferences drawn from those facts by resident judges.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008)). We "presume—even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019). "[T]he appellant bears the burden of showing that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error." *Scott v. Commonwealth*, 68 Va. App. 452, 458 (2018) (quoting *Sanders v. Commonwealth*, 64 Va. App. 734, 743 (2015)). But we "must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Moore v. Commonwealth*, 69 Va. App. 30, 36 (2018) (quoting *Commonwealth v. Robertson*, 275 Va. 559, 563 (2008)). And we review the trial court's application of law *de novo*. *Bagley*, 73 Va. App. at 13.

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). The Fourth Amendment imposes two requirements. First, the traffic stop must be "a lawful investigatory stop"—a condition that is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). And second, the "officer's actions

- 7 -

during the stop [must be] reasonably related in scope to the basis for the stop." *United States v. Perez*, 30 F.4th 369, 374 (4th Cir. 2022).

Hypes does not challenge that he was lawfully stopped for an improper lane change.[2] He claims instead that the officers unconstitutionally prolonged the traffic stop beyond its proper scope.

As the United States Supreme Court explained in *Rodriguez*, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. at 350. "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350-51 (alterations in original) (quoting *Caballes*, 543 U.S. at 407). An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop"—such as a dog sniff—but he "may not do so in a way that prolongs the stop" if he does not also have "the reasonable suspicion" of other criminal activity "ordinarily demanded to justify detaining an individual." *Id.* at 355. The seizure of the traffic stop "remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (alteration in original) (quoting *Johnson*, 555 U.S. at 333). *Rodriguez* rejected the idea that prolonging a stop without reasonable suspicion can be *de minimis*. *Id.* at 356-57.

Tasks that fall within the lawful scope of a traffic stop include those related to securing officer safety, maintaining the safety of the highways, checking the driver's license, inspecting the vehicle's registration and proof of insurance, and determining whether the driver has outstanding warrants. *Id.* at 355-56; *see also Perez*, 30 F.4th at 375. Tasks that exceed the

---

[2] *See also, e.g.*, *Shifflett v. Commonwealth*, 58 Va. App. 732, 738-39 (2011) (describing circumstances supporting the reasonable suspicion that a farm-use vehicle was being operated on a public highway in violation of statutory restrictions).

mission of the stop include questioning the motorist about his criminal history and waiting for the arrival of "a K-9 unit to conduct a dog sniff." *Matthews v. Commonwealth*, 65 Va. App. 334, 345 (2015).

Whether a stop has been prolonged by an officer is heavily fact-dependent, turning on whether such action "adds time to[] the stop." *Rodriguez*, 575 U.S. at 357 (internal quotation marks omitted). In reviewing the facts, appellate courts give great deference to the trial court's findings. *E.g.*, *Bagley*, 73 Va. App. at 13.

We cannot say that the trial court plainly erred in finding that the officers here did not prolong the stop for the K-9 unit to conduct a dog sniff. It was permissible for Deputy Hodge to call for the K-9 unit while he awaited the VIN results he had requested. "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop." *Rodriguez*, 575 U.S. at 357 (citation omitted). In finding that the dog sniff did not prolong the stop, the trial court relied on Hodge's testimony—which the court found credible—that the time it would take Hodge to prepare the summons and notice of suspension was about as long as the time between when Hypes's truck came to a stop and when the K-9 unit arrived. Hodge testified that he started to prepare the paperwork when he received the VIN information. He was still working on it when Giampocaro arrived and proceeded to conduct the dog sniff, which took about five minutes. Hodge testified that it took him "[a]t least thirteen" minutes to complete the paperwork, and the trial court found that he was still working on the paperwork when Giampocaro completed the dog sniff.

We are not persuaded by Hypes's claim that Hodge failed to exercise due diligence and delayed the stop by waiting for the result of his VIN inquiry before preparing the summons and the license-suspension notification. Hypes's counsel conceded at oral argument that the VIN

information was relevant and important in traffic stops involving farm-use vehicles. It was reasonable for Hodge to determine whether the truck properly bore farm-use tags and whether other violations existed. Since Hypes lacked written proof of registration, Hodge had to seek that information from the sheriff's office. That Hodge did not ultimately write the VIN on the summons does not show that his inquiry was unrelated to the proper mission of a traffic stop, which typically includes inquiries about the vehicle's ownership and registration. *Rodriguez*, 575 U.S. at 355. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

While an officer must be "reasonably diligent" in completing "traffic-based inquiries expeditiously," *id.* at 357, the standard is reasonableness, not maximum speed. Hypes has not cited any authority that the Fourth Amendment compelled Hodge to start writing the summons and suspension notice as soon as possible, before he received the VIN information, and to complete it as fast as possible. The question is "when tasks tied to the traffic infraction are—*or reasonably should have been*—completed." *Id.* at 354 (emphasis added). As long as the officers completed their duties with "reasonable diligence" and did not act to prolong the stop "for purposes beyond the mission of the stop," courts do not require that they act in the fastest or most efficient manner possible. *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017); *Perez*, 30 F.4th at 375-76.

In short, we cannot say that the trial court was plainly wrong, *Bagley*, 73 Va. App. at 1, in finding that Hodge did not delay the stop to enable the dog sniff.[3] There was sufficient evidence

---

[3] We note that the trial court did not specifically rely on Hodge's testimony that he did not purposefully delay in writing either the summons or the license-suspension notice. We too find the record sufficient, even without that testimony, to support the trial court's finding that the stop was not prolonged to enable the dog sniff. Accordingly, we need not address whether a trial court may properly rely on an officer's state-of-mind testimony in determining whether a traffic stop is improperly prolonged under *Rodriguez. Compare United States v. Elias*, No. CR-17-0091-RHW, 2018 WL 748147, at *3 (C.D. Cal. Feb. 5, 2018) ("[W]here the extension of the

in the record to support the conclusion "that the presence of the K-9 unit on the scene was contemporaneous with the officers' diligent pursuit of the mission of the stop." *Hill*, 852 F.3d at 384.[4]

### B. *The evidence sufficed to support Hypes's convictions.*

In his other assignment of error, Hypes argues that the trial court should have granted his motion to strike and renewed motion to strike because the evidence failed to prove that he possessed the firearm[5] or the methamphetamine. In reviewing a trial court's denial of a motion to strike, we "uphold the judgment of the trial court unless it is plainly wrong or without evidence to support it." *Moore v. Commonwealth*, 59 Va. App. 795, 804 n.4 (2012). We regard all credible evidence favorable to the prevailing party as true and disregard all conflicting evidence. *See id.* at 803-04. The same standard applies to reviewing the sufficiency of the evidence. *See Massie v. Commonwealth*, 74 Va. App. 309, 315 (2022).

"Constructive possession may be established by 'evidence of acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the defendant was aware

---

stop must be motivated by the 'mission of the stop,' the subjective reasons for the extension are the determinative issue." (quoting *Rodriguez*, 575 U.S. at 356)), *with Baxter v. Roberts*, No. 5:19cv216-MCR/MJF, 2021 WL 1166764, at *6 (N.D. Fla. 2021) ("Despite the fact that [the officer] stated he intended to conduct a dog sniff, his subjective motivations have no bearing on the objective inquiry into whether the stop and its scope were reasonable on the totality of the circumstances."), *appeal docketed*, No. 21-11428 (11th Cir. Apr. 27, 2021). *Cf. Murray v. United States*, 487 U.S. 533, 540 n.2 (1988) (noting that a trial court, when evaluating whether officers discovered evidence from a source independent of an illegal search, may consider but is not required "to give dispositive effect to police officers' assurances" if "the facts render those assurances implausible").

[4] Because we find that the traffic stop here was not prolonged in violation of *Rodriguez*, we do not reach Hypes's argument that the officers lacked reasonable suspicion to prolong the stop.

[5] Hypes does not dispute his status as a felon. The court admitted into evidence without objection the sentencing order for Hypes's previous conviction of possessing a Schedule I or II controlled substance.

of both the presence and the character of the [contraband] and that it was subject to his dominion and control.'" *Hall v. Commonwealth*, 69 Va. App. 437, 448 (2018) (quoting *Logan v. Commonwealth*, 19 Va. App. 437, 444 (1994) (en banc)). The issue of what constitutes constructive possession "is largely a factual one," so we give deference to the trial court's factual findings. *Smallwood v. Commonwealth*, 278 Va. 625, 630 (2009) (quoting *Ritter v. Commonwealth*, 210 Va. 732, 743 (1970)).

Occupancy or proximity alone do not prove constructive possession, but they are circumstances "that may be considered together with other evidence tending to prove that the . . . occupant exercised dominion and control" over the contraband. *Redmond v. Commonwealth*, 57 Va. App. 254, 264-65 (2010) (quoting *Burchette v. Commonwealth*, 15 Va. App. 432, 435 (1992)); *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008). To sustain a conviction for constructive possession, additional evidence must show that the occupant knew of "the presence, nature and character of the contraband at the time of such ownership or occupancy." *Redmond*, 57 Va. App. at 265 (quoting *Burchette*, 15 Va. App. at 435).

Constructive possession may be proved purely by circumstantial evidence. "[I]t 'is axiomatic that any fact that can be proved by direct evidence may be proved by circumstantial evidence.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 6 (2004)). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Ervin*, 57 Va. App. at 505 (alteration in original) (quoting *Stamper v.*

*Commonwealth*, 220 Va. 260, 273 (1979)). The "accumulation of various facts and inferences, each mounting upon the others," may constitute sufficient evidence to sustain a conviction. *Id.*

The record supports the trial court's conclusion that Hypes was aware of both the firearm and the methamphetamine. The officers found the Ruger 9mm handgun underneath the front passenger seat, next to a glass pipe used to smoke methamphetamine. When Hodge questioned him about the firearm, Hypes immediately disclaimed his passenger's ownership of the gun and claimed it was his. He explained that "he had been recently jumped and was carrying the firearm for protection." To be sure, Hypes testified at trial that Hodge must have misunderstood him; he claimed saying only that his mother and a co-worker had the firearm for protection. But the trial court was "entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused [was] lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). The trial court likewise found not credible the testimony of Hypes's mother, who claimed that the gun was hers. And in any case, the Commonwealth did not need to prove who *owned* the firearm; a defendant can possess a firearm without owning it and without having exclusive possession. *Smallwood*, 278 Va. at 631; *Hall*, 69 Va. App. at 449 n.6. The evidence sufficed to prove Hypes's possession of the gun under the passenger seat.

The evidence also sufficed to prove Hypes's possession of narcotics. The officers found a metal container containing items with methamphetamine residue in the backseat of the truck. The metal container was monogrammed with Hypes's initials. Hypes also implied that it was his, saying that he was cleaning out his house and throwing things away. At trial, Hypes testified that the items belonged to a roommate; he claimed not to know what they were and said he was just throwing them out. Yet he also testified that he "understood the scales and stuff, what it would be for," though he didn't know they had residue on them, and "that's why [he] wanted to

- 13 -

get it out of [his] house," because he "didn't [want to] be in trouble if something were to happen later on." That last statement, construed in the light most favorable to the Commonwealth, shows both that Hypes knew the nature of the item (it was used for contraband and could get him in trouble) and that he was aware of its presence in the truck (he was getting rid of it). Given his initials on the container and his admissions to Hodge and at trial, the evidence sufficed for the trial court to find that Hypes possessed the drug paraphernalia, including the bowl that contained the methamphetamine residue.

## CONCLUSION

The trial court committed no error in denying Hypes's motion to suppress the evidence and in judging that evidence sufficient to find Hypes guilty beyond a reasonable doubt of possessing narcotics and possessing a firearm after having been convicted of a felony.

*Affirmed.*