COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges AtLee, Causey and Friedman
Argued at Norfolk, Virginia


THEODORE WEAVER, JR.

                                              MEMORANDUM OPINION* BY
v.       Record No. 0938-22-1                 JUDGE RICHARD Y. ATLEE, JR.
                                              JUNE 27, 2023

COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                           Everett A. Martin, Jr., Judge

              (Emily M. Munn; Emily M. Munn, PC, on brief), for appellant.
              Appellant submitting on brief.

              Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
              Attorney General, on brief), for appellee.


       The Norfolk Circuit Court convicted appellant Theodore Weaver, Jr., of two counts of rape,

three counts of forcible sodomy, one count of abduction with intent to defile, and one count of

conspiracy to commit rape.  Weaver contends that the evidence was insufficient to prove he was the

perpetrator of the offenses rather than a victim of the crimes.  For the following reasons, we

disagree and affirm.

                                   I. BACKGROUND

       We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party

in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires that we "discard the evidence

of the accused in conflict with that of the Commonwealth, and regard as true all the credible

_____
       * This opinion is not designated for publication.  *See* Code § 17.1-413.

evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

In 2019, D.R.[1] was a student at Norfolk State University. After completing the spring semester of her junior year, D.R. returned home to Massachusetts for the summer break. D.R. returned to Virginia over the summer holiday to celebrate her birthday. She was in town for about a week leading up to the night of July 1, 2019, and intended to fly back to Massachusetts the following day. At that time, D.R. had known Weaver for about ten years because he used to date her best friend, Bria. D.R. considered Weaver a "good" friend.

In the days leading up to July 1, Weaver told D.R. that someone had sent explicit photos of her in a group chat and said he was going to post them online and he wanted to help her "get rid" of the photos before they were posted. Weaver further explained that his brother worked for the police department and could assist them with tracking down the person who had the photos and help delete them. Under the pretext of tracing the photos and preventing them from being posted, Weaver told D.R. to come over to his apartment. D.R. and Weaver spoke via text with the person who allegedly posted the photos of D.R. in the group chat to confront him about his intent to expose the photographs. That person instructed Weaver to take an explicit photograph of D.R. and send it to him. D.R. refused. Weaver then "started receiving threatening text messages from this person" who seemed to know where Weaver lived. At some point, D.R. left Weaver's apartment.

On July 1, 2019, Weaver called D.R. and suggested that they spend time together before she left town. D.R. agreed to meet Weaver at his apartment later that night. Weaver asked her to come alone and stated that his brother planned to meet them after work to discuss the photos. D.R. arrived at Weaver's residence around 1:30 a.m. Weaver told D.R. that his brother was on the way

---

[1] This Court uses the victim's initials to protect her privacy.

over and appeared to talk to him on the phone, but Weaver's brother never arrived. Instead, at around 2:15 a.m., "[t]here was a bang on the door." Weaver opened the door and then stepped aside as an intruder "barged in." Weaver held his stomach and screamed that the intruder had stabbed him.

Although the intruder's face was covered, D.R. noticed that he was an African-American male, about twenty-one years old, and was just five-foot-three or five-foot-four inches tall. The intruder held what appeared to be a kitchen knife in his left hand, and his right hand was "inside of his pocket seeming like he was holding a gun." The intruder yelled that Weaver and D.R. should have complied with his instructions and said, "I told you I knew where you lived." After threatening to kill them both, the intruder instructed Weaver and D.R. to undress. D.R. undressed, while Weaver "took off his pants and his underwear, but he kept his shirt on." The intruder ordered D.R. to perform oral sex on Weaver and threatened to kill them if she did not comply. Weaver sat on the couch, and D.R. put his penis in her mouth as the intruder stood behind her. When Weaver stated that his father might come home soon, they moved to Weaver's bedroom.

In the bedroom, the intruder told D.R. to get on the bed and "forced" Weaver and D.R. to have sex. The intruder repeatedly threatened to shoot them if they did not comply. D.R. was "hysterically crying" and told them that she "didn't want to do it." Weaver kept saying, "I know. It's okay." Weaver put his penis in D.R.'s vagina and engaged in sexual intercourse with her. D.R. "was kneeling in the middle of the bed, [Weaver] was behind [her], and the intruder was standing in front of the bed" still holding the knife toward her. The intruder then told Weaver to lay down in front of D.R. and ordered her to perform oral sex on Weaver while the intruder inserted his penis in her vagina, as he brushed her back with the knife. The intruder commanded Weaver to again engage in sexual intercourse with D.R. Because "[i]t was not going in," Weaver performed

- 3 -

cunnilingus on D.R. before again inserting his penis, and he proceeded to have sex with D.R. until he ejaculated.

Afterwards, Weaver and the intruder talked as they left the bedroom and then they stood "out in the living room for a while." Weaver returned to the bedroom and said, "I know who this person is. I just seen their car. I'm about to go get him." Weaver suggested that D.R. rinse herself off in the shower and told her to get dressed. Weaver instructed D.R. not to tell the police "because they won't do anything about it." He also told her not to tell their mutual friend Bria. Weaver's brother never arrived.

Weaver's best friend, Collin Lindsey, testified at trial. Lindsey and Weaver were also friends with William Phillips. Lindsey testified that Phillips drove Lindsey and Weaver to Weaver's apartment on the night of July 1, 2019. When they arrived, Weaver and Lindsey left Phillips waiting in his car and walked toward Weaver's residence. Weaver told Lindsey that D.R. was waiting in his apartment and explained that she "did [him] dirty." Weaver said, "[s]he ran me out of my own money, basically left me for broke and so now I got her here, but she's only here because I told her that my cousin was going to get some nudes deleted off her phone so that it would be wiped away completely." Weaver asked Lindsey to help him pull off a "fake robbery" and instructed him to enter the apartment and say, "I told you that I was going to find -- I told you I know where [Weaver] lived at." If D.R. did not comply, Lindsey was supposed to tell her that he would post the nudes and send them to her family. Weaver told Lindsey, "You don't have to do anything for real, just play the part. I don't need you to touch her. I don't need you to do anything else. Just scare her."

Weaver then went to his apartment and retrieved a bookbag containing a "blue jacket, [a] grayish T-shirt, and a knife and eyeglass case." Weaver told Lindsey to wear the jacket and put the gray t-shirt around his face to conceal his identity. Weaver said the knife was "just for the extra

- 4 -

effort so it can look real." The eyeglass case was "so you can look like you have a gun in your hand." Weaver instructed Lindsey to count to fifteen and then knock on the door. When Weaver answered, Lindsey was to rush at Weaver and pretend to stab him.

Lindsey followed Weaver's orders and when Weaver answered the door, Lindsey "rushed him." Weaver "backed up like he got stabbed" and "fell back." Lindsey did not actually stab Weaver. When Weaver told D.R. that Lindsey had a gun, she froze. Lindsey told Weaver and D.R. to surrender their phones, and he looked inside D.R.'s purse. Finding nothing, he looked at Weaver for further instructions. Weaver "makes a motion like he's taking off his shirt," so Lindsey told D.R. and Weaver to "strip," and then after Weaver made another hand motion,[2] he told D.R. to "give [Weaver] head." When D.R. "started to panic," Weaver told Lindsey, "[h]old on, [h]old on. Please let me calm her down first." After Weaver calmed her, D.R. followed Lindsey's instructions.

Lindsey testified that Weaver motioned Lindsey to the bedroom and they all walked in that direction. Before they reached the room, Weaver pushed Lindsey into the bathroom and pretended to engage in a scuffle while secretly telling Lindsey that he needed to "join in" because it would "look weird if [Weaver was] the only person that's getting something and [Lindsey was] not. It's going to look real messed up . . . ." Lindsey walked with Weaver to the bedroom and pushed him inside. Lindsey ordered D.R. to "[a]ssume the position" and watched her and Weaver have sexual intercourse. Weaver motioned for Lindsey to get in front of D.R. and engage in oral sex. Next, he motioned for Lindsey to switch places with him. Lindsey switched with him and engaged in sexual intercourse with D.R., while Weaver stood in front of her for oral sex. Weaver motioned Lindsey out of the way so he could resume sexual intercourse with D.R. Weaver performed cunnilingus on

---

[2] The record describes the motion as Lindsey "making an[] up and down motion with his right hand. It's opened palm down, and he's sort of moving it in an up and down in front of his body."

- 5 -

D.R. and then penetrated her vagina again and eventually ejaculated on her. After the assault, Lindsey and Weaver went to the living room where they got into an argument. Lindsey then left the apartment and ran to Phillips's car. He estimated that the encounter took between 45 minutes to an hour. On cross-examination, Lindsey admitted that he hoped to receive leniency for his testimony.

Phillips testified that Lindsey was his "[b]est friend[], a brother," and Weaver was his "good friend." He explained that on the afternoon of July 1, 2019, he sent a series of text messages to Weaver at Weaver's request. Weaver called Phillips beforehand and told him what the contents of the text messages should be. The first message stated that "[y]ou better stop playing before I leak them." Further messages instructed D.R. to undress, threatened to leak the photos, and stated that he knew where Weaver lived and would "ruin [their] lives."

Later that evening, Phillips drove Weaver and Lindsey to Weaver's apartment. After Weaver and Lindsey exited the car, Phillips waited for them for at least an hour. When Lindsey returned, Phillips noticed that he had changed his clothes and that he was "sweaty." Weaver returned to the car approximately five to ten minutes after Lindsey with a bookbag in his hands. After they dropped Weaver off, Lindsey admitted to Phillips that he had done "something wrong." Two weeks later, Weaver told Phillips that he was "robbed by someone" who "forced him to do sexual acts onto the girl." Weaver also told Phillips that he had been stabbed in the stomach or chest area, but Phillips did not see any kind of injury. During this discussion, Weaver deleted the message thread between the two of them, which included the five text messages from July 1, 2019.

Detective Ryan Davis interviewed Weaver on July 16, 2019, after Weaver turned himself in. During the six-hour interview, Weaver admitted he was friends with Lindsey, Phillips, and D.R. and stated that he considered himself "a protector or something" for D.R. Davis confronted Weaver about the text message thread that had been deleted from his phone. Weaver gave several different excuses for why the messages had been deleted, claiming at one point that something did not upload

- 6 -

to iCloud and then at another point claiming his phone "just randomly deletes stuff and uploads itself in the middle of the night randomly." Upon further inquiry, Weaver admitted that he asked Phillips to send the text messages to his phone so it would look like they were coming from a third party. Detective Davis also asked Weaver about the compromising photo of D.R. Weaver first said he received the photo because it was being sent "between all these people," but then he later admitted that he already had the photo on his phone.

Weaver admitted that he showed D.R. the picture and said he knew someone who could "help her from getting extorted." Weaver conceded that this was "a [ruse] for him to have an intervention with her about posting nudes." Detective Davis testified that Weaver's version of the events changed multiple times during the interview and included various accounts of Lindsey's and Phillips's involvement. Weaver initially claimed that he had been stabbed, but then said he may have been "grazed by a knife" or "[m]aybe it was the door handle . . . going into his body." Weaver claimed that he was held at gunpoint and at knifepoint as the intruder yelled at them to give him "[their] stuff" before having them "sit on the couch and undress each other or both get undressed." The intruder instructed D.R. to perform oral sodomy on Weaver and then told them to go to the bedroom. Weaver claimed that "he originally protested and that he was actually struck by the home invader . . . in the back of the head and forced to go into the bedroom" and he thought about "actually turning and fighting him," but got struck in the back of the head again and pushed towards the bedroom.

Weaver then gave conflicting statements about the intruder taking his wallet, phone, and other items from the apartment, and he gave an inconsistent account of his actions following the assaults. Detective Davis testified that Weaver admitted he told D.R. that he was going to go get stitches but that he never went to the hospital. He denied telling D.R. to shower after the sexual assaults.

Weaver did not present any evidence and, instead, moved for the circuit court to strike the evidence and dismiss the indictments. Weaver argued that the evidence failed to prove he was a perpetrator of the offenses rather than a victim. The circuit court disagreed and convicted Weaver on two counts of rape, three counts of forcible sodomy, abduction with intent to defile, and conspiracy to commit rape. This appeal followed.

## II. ANALYSIS

Weaver does not dispute that the Commonwealth's evidence proved the elements of each offense beyond a reasonable doubt. He argues only that the evidence failed to prove he was the perpetrator of the crimes and asserts, instead, that he was a victim himself.

### A. *Standard of Review*

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

### B. *Sufficiency of the Evidence*

Weaver contends that the evidence was insufficient to support his convictions because it was based entirely upon Lindsey's "inconsistent and biased testimony" which was not credible due to his "admitted reason to fabricate [Weaver's] role in this incident." However, "issues of witness credibility and the weight afforded a witness'[s] testimony 'are matters solely for the fact finder[,]

who has the opportunity to see and hear that evidence as it is presented.'" *Hammer*, 74 Va. App. at 239 (second alteration in original) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018)). "When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree." *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). "[T]he fact that the witness'[s] credit is impeached by contradictory statements affects only the witness'[s] credibility; contradictory statements by a witness go not to competency but to the weight and sufficiency of the testimony." *Id.* (quoting *Swanson*, 8 Va. App. at 379). If the fact finder believes that testimony, and the testimony viewed along with the other evidence is sufficient to support the verdict, "there can be no relief in the appellate court." *Id.* (quoting *Swanson*, 8 Va. App. at 379).

It follows that "this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). "In other words, this Court cannot say a witness'[s] testimony is inherently incredible unless it is 'so contrary to human experience as to render it unworthy of belief.'" *Lambert*, 70 Va. App. at 759 (quoting *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011)).

The facts in this case, viewed in the light most favorable to the Commonwealth, established that Weaver contacted D.R. on July 1, 2019, and suggested that she visit him before she returned

home. Weaver asked D.R. to come to his apartment *alone* later that night under the guise of discussing the explicit photos he claimed someone had sent in a group text. He said his brother, a police officer, would come over after work to help delete the photos. Weaver later admitted to Detective Davis that he created the ruse to stage an "intervention" with D.R. about "posting nudes." In furtherance of that ruse, Weaver asked Phillips to send text messages demanding that D.R. undress and containing threats to further expose her. Weaver told Phillips what to write in the messages, including an instruction that he would ruin their lives if they did not comply with his demands and a statement that he knew where Weaver lived. That night, Phillips drove Weaver and Lindsey to Weaver's apartment and watched them both exit his vehicle at that location. He then waited for over an hour before Lindsey returned "sweaty" and having changed his clothes. Weaver returned five or ten minutes later and was evasive when Phillips asked Weaver "about what really went down in that house." Phillips's testimony was corroborated both by the text messages he sent to Weaver, which were admitted into evidence at trial, and by Lindsey's version of events.

Indeed, Lindsey testified that after he and Weaver exited Phillips's car, Weaver asked him to pull off a "fake robbery" because D.R. did him "dirty" and "left him for broke." From a bookbag, Weaver provided Lindsey a blue jacket, a knife, an eyeglass case to hold in his pocket so it would look like he was holding a gun, and a grayish t-shirt to conceal his face. Consistent with the elaborate ruse he had already arranged, Weaver instructed Lindsey to say he had warned them that he knew where Weaver lived and that they should have complied with his instructions. Weaver told Lindsey to pretend to stab him when he barged into the apartment. Lindsey followed Weaver's instructions and, at Weaver's urging, forced D.R. at knifepoint to engage in oral sodomy and sexual intercourse with both men. Lindsey's testimony was corroborated by Phillips's testimony and by D.R. Indeed, Lindsey's testimony about what occurred inside Weaver's apartment was remarkably, almost overwhelmingly, consistent with D.R.'s testimony.

D.R.'s account only differed from Lindsey's in that she did not mention a bookbag, she did not see any of Weaver's hand gestures to Lindsey (which follows, given that he made these gestures while standing behind her), and she did not testify to being alone in the bedroom while Weaver and Lindsey engaged in a fake struggle in the bathroom. D.R.'s version of events also differed from Lindsey's testimony when she testified that he "caressed" her with the knife and that Weaver told him to stop it. Lindsey denied he did that. In any case, it was within the purview of the circuit court to resolve any inconsistencies between Lindsey's testimony and that of the other witnesses. In fact, the circuit court expressly stated that it did not believe Lindsey's testimony in its entirety about his conversation with Weaver outside the apartment, or his testimony about Weaver's hand signals, and instead, concluded that there "was an agreement to commit this sex offense before Mr. Lindsey walked through the door." "[T]he trier of fact is free to believe or disbelieve, in whole or in part, the testimony of any witness." *Rams v. Commonwealth*, 70 Va. App. 12, 38 (2019).

That Lindsey hoped to gain leniency for his role in this assault does not render his testimony inherently unbelievable. The circuit court was aware of Lindsey's reason for testifying. In any case, Lindsey's testimony was corroborated by D.R. and Phillips and even, in part, by Weaver's statements to police. The circuit court was, therefore, not plainly wrong in accepting Lindsey's testimony as true. *See Lambert*, 70 Va. App. at 760 (holding that a witness's testimony, which was corroborated by other evidence, was not inherently incredible).

Finally, Weaver's assertion that his version of events was more believable than Lindsey's is as unavailing on this Court as it was in the circuit court. Indeed, in rendering its verdicts, the circuit court expressly stated:

> First, I recognize each of us have a different physiology and are aroused by different stimuli, but I find it very difficult to believe a man could get an erection when ordered to rape a good friend.

Secondly, after this was over, he sends [D.R.] home. They could have gone to the police station which was a short distance from where he lived.

He falsely claimed to have been stabbed. He couldn't identify Mr. Lindsey when he'd known him for ten years and he was with him for an hour.

He tells [D.R.] not to call the police or call [Bria]. The cousin, friend, law enforcement officer, whoever this fictitious person was, is going to delete the photographs never appeared, and he was only five minutes away.

Nine hours before this happened at three p.m. he has Mr. Phillips send him a text message now [D.R.] gets undressed. Nine hours later [D.R.] is undressed and raped. He deleted the text message threat of Commonwealth's Exhibit 2 from his phone and from Mr. Phillips' phone.

We are "bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them." *Matthews v. Commonwealth*, 65 Va. App. 334, 341 (2015) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)). In this case, the circuit court's factual findings are supported by the evidence. Moreover, the circuit court emphasized Weaver's "[in]numerable inconsistent statements to the police." "A defendant's false statements are probative to show he is trying to conceal his guilt, and thus [are] evidence of his guilt." *Taylor v. Commonwealth*, 61 Va. App. 13, 31 (2012) (quoting *Rollston v. Commonwealth*, 11 Va. App. 535, 548 (1991)).

In summary, from this record, a reasonable fact finder could conclude that Weaver developed an elaborate plan in advance of D.R.'s visit to convince her that she was in danger of exposure for the explicit photographs he lied about finding in a nonexistent group chat. Weaver then solicited the help of his friends to lure D.R. to his apartment and to isolate her there, so he could sexually assault her. Moreover, a reasonable fact finder could conclude that Weaver's suggestion that D.R. take a shower, his instruction for her not to contact the police, and his

contradictory statements to the police were designed to conceal his guilt. Therefore, the circuit court was not plainly wrong in rejecting Weaver's claim of innocence and concluding that the evidence was sufficient to convict.

### III. CONCLUSION

We leave undisturbed the circuit court's factual findings and its resolution of the credibility of the witnesses where, as here, they are not plainly wrong or without evidence to support them. Nothing in the record compels a finding that Lindsey's testimony was "so manifestly false" that it could not be believed or that it was proven false by other evidence presented at trial. *Juniper*, 271 Va. at 415 (quoting *Cardwell*, 209 Va. at 414). Because the Commonwealth presented overwhelming evidence of Weaver's culpability, the circuit court did not err in rejecting Weaver's assertion that he was a mere victim of the crimes, rather than the perpetrator. Weaver's convictions are affirmed.

*Affirmed.*