COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Fulton and Lorish
Argued at Norfolk, Virginia


NAFEESA RAUSHAUM KNIGHT-WALKER

                                              MEMORANDUM OPINION* BY
v.        Record No. 1118-23-1                JUDGE JUNIUS P. FULTON, III
                                              JANUARY 28, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L.D. Flythe, Judge[1]

Jason A.S. Drake, Assistant Public Defender, for appellant.

J. Brady Hess, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Under a written plea agreement, Nafeesa Knight-Walker entered a conditional guilty plea to

misdemeanor possession of controlled paraphernalia, reserving her right to challenge the trial

court's denial of her motion to suppress. Upon her plea, the trial court convicted Knight-Walker

and sentenced her to 12 months of incarceration with all 12 months suspended. This appeal follows.

I.  BACKGROUND[2]

On November 15, 2021, Officer Jordan Allen of the Newport News Police Department

was following a silver Nissan sedan driving around 30 miles per hour in a 45 mile-per-hour zone

at about 1:30 a.m. While following the sedan, Allen conducted a registration check on the

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable Timothy S. Fisher presided over Knight-Walker's suppression hearing.

[2] "Under the applicable standard of review, we view the evidence in the light most
favorable to the Commonwealth as the party who prevailed below." *Bennett v. Commonwealth*,
69 Va. App. 475, 479 n.1 (2018) (citing *Riner v. Commonwealth*, 268 Va. 296, 303, 327 (2004)).

vehicle and a license check on the registered owner of the vehicle. The license check indicated that the owner of the Nissan had a suspended license. Allen pulled up the DMV photo on the owner of the Nissan and drove up to the side of the vehicle to verify that the driver matched the description of the owner. Seeing that the woman driving the Nissan "also matched" the description of the registered owner, Allen conducted a traffic stop in a CVS parking lot. As Allen exited his vehicle, a second police vehicle arrived at the scene of the stop.

When Allen approached the Nissan, he told the driver that he had pulled her over because the registered owner of the vehicle had a suspended license and asked for her license and registration. Allen also asked if there were any weapons in the vehicle. The driver, who later identified herself as Nafeesa Knight-Walker, replied "No" regarding weapons and said that her mother was the owner of the vehicle. She also asked whether "that was the only reason why he pulled her over." Allen answered that he pulled her over for that reason and also because she was going 30 miles per hour in a 45 mile-per-hour zone. After rummaging through her pocketbook and the interior of the vehicle, Knight-Walker provided Allen with her license but could not find the vehicle's registration. She again informed Allen that it was registered to her mother and that they lived at the same address. Allen returned to his vehicle and ran Knight-Walker's information, discovering her driver's license was also suspended.

Allen kept Knight-Walker's license in his patrol car, and reapproached the Nissan, informing Knight-Walker that her license was suspended and that records indicated that she had received notice by mail. Allen told Knight-Walker that she could not drive the vehicle with a suspended license and asked her passenger if he had a valid driver's license. The passenger indicated that he also could not drive the vehicle. Taking her cell phone in hand, Knight-Walker said that she would call her son to pick them up. Allen told Knight-Walker that it was her third offense of driving with a suspended license and that, although this was an arrestable offense, he

was not going to arrest her because she had been "nice" during their encounter. Allen reiterated that Knight-Walker could not drive the car and Knight-Walker, with cell phone in hand, repeated that she would call her son.

At this time, Allen said "I know I asked you. I want to make sure we're on the same page here, no weapons in the vehicle. Do you have any drugs at all in the car?" Knight-Walker responded "No, I do not." Allen then asked, "No marijuana, no cocaine, no heroin, nothing crazy?" Knight-Walker answered, "No marijuana, no cocaine, no illegal substances at all." Allen asked Knight-Walker if she would mind if he checked the vehicle for illegal substances. Knight-Walker did not immediately answer but paused for a moment, then turned her head away from Allen and grabbed the back of her neck, and said "um" before Allen continued, "it'll be real quick. I just want to make sure nothing's in the car." Knight-Walker then opened the door and got out of the vehicle. Once Knight-Walker opened the door, Allen asked the second officer to have the passenger step out of the vehicle, too.

When Knight-Walker got out of the Nissan, Allen asked if she had anything on her person and she responded "No." Allen asked if he could pat her down, and Knight-Walker answered with an "Mhmm." After Knight-Walker faced the vehicle, Allen conducted a pat down of her person. During the search of the vehicle, Allen discovered "an item . . . that was considered to be drug paraphernalia" inside the glove box of the Nissan.

On June 13, 2022, a grand jury sitting in the Circuit Court for the City of Newport News indicted Knight-Walker for one count of possession of cocaine. On September 15, 2022, Knight-Walker filed a motion to suppress, seeking to exclude "all [her] statements and all evidence that stems from those statements due to an illegal seizure that occurred during a traffic stop, including all evidence seized from the vehicle that defendant was driving" because they were obtained in violation of the Fourth and Fourteenth Amendments of the United States

Constitution and Article I, § 8 of the Constitution of Virginia. Knight-Walker argued that Allen "lacked reasonable suspicion that [she] was armed and dangerous" and "lacked a reasonable suspicion [that] she had committed a crime for which evidence could be gathered through a search of her car[.]" Knight-Walker also argued that Allen "impermissibly extended her detention by pursuing an unrelated line of inquiry during his handling of a routine traffic offense in contravention of the United States Supreme Court's decision in *Rodriguez v. United States*" and that he "lacked [her] free, voluntary, and unequivocal consent to search her vehicle and could not have obtained as much in any event, as a reasonable person would not have felt free to disregard his request under the circumstances."

On September 22, 2022, the trial court heard oral arguments on the motion to suppress and noted that neither Knight-Walker nor her passenger was authorized to drive the vehicle. The trial court further explained that if Allen left Knight-Walker at the scene and "then 20 minutes later he sees her driving the car" that he would have to stop her again. The trial court noted that "she stopped . . . and that car is not going anywhere unless someone shows up that's a licensed driver and can drive the car," and if that was not possible the next step would be to call a tow truck. The trial court then articulated that it "would not be unreasonable to say, okay, we'll wait, we'll get somebody here and drive the car away . . . but leaving [Knight-Walker] with the car . . . and [the officer] driv[ing] away means she's going to drive the car, and that's a crime, and he can't let that happen."

The trial court distinguished the stop here from *Rodriguez* stating that "Mr. Rodriguez had a valid driver's license. He was eligible to leave the scene until something else happened at that point. So [the stop] was extended by that." The trial court ultimately ruled that "[on] the issue of extending the stop, the [car] was going nowhere at that point. That car was not moving . . . the Motion to Suppress is denied."

On the issue of consent, the trial court noted that Allen asked Knight-Walker to get out of the car and asked, "do you mind if I pat you down? [W]hat did she do? She turned around and put her hands on top of the car." The trial court explained that it thought "the Court expects people who are stopped to understand what it is that they have to do or don't have to do, and to tell officers what it is that they agree or don't agree to" and "in this case there was nothing that I saw that would indicate that [Knight-Walker] was saying, oh, no, we're not doing anything of this." Knight-Walker now appeals.

## II. ANALYSIS

Knight-Walker assigns error to the trial court's denial of her motion to suppress, asserting that the trial court erred because: (1) Allen impermissibly exceeded the bounds of the traffic mission for which he had stopped Ms. Knight-Walker's vehicle; and (2) Ms. Knight-Walker did not provide free and voluntary consent to search her vehicle beyond mere acquiescence to the search.

In determining whether to affirm the denial of a suppression motion, an appellate court gives deference to the trial court's factual findings but independently determines the lawfulness of the manner in which the evidence was obtained. *See Jones v. Commonwealth*, 277 Va. 171, 177 (2009). "Ultimate questions of reasonable suspicion and probable cause . . . involve questions of both law and fact and are reviewed *de novo* on appeal." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc) (quoting *Ornelas v. United States*, 517 U.S. 690, 691 (1996)). Similarly, the trial court's decision whether the Fourth Amendment was implicated at all requires this Court to review de novo "whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." *Hughes v. Commonwealth*, 31 Va. App. 447, 454 (2000) (en banc) (citing *McGee*, 25 Va. App. at 198). "Whether the Fourth Amendment has been

violated is a question to be determined from all the circumstances." *McCain v. Commonwealth*, 275 Va. 546, 552 (2008).

### A. *The Bounds of the Traffic Mission for Which Allen stopped Knight-Walker*

Allen initially pulled Knight-Walker over because a license check on the registered owner of the vehicle indicated that the owner had a suspended license. Determining that Knight-Walker "also matched" the DMV photo of her mother, the registered owner, Allen initiated a traffic stop to inform her that the registered owner of the vehicle had a suspended license. After Knight-Walker informed Allen that her mother was the registered owner of the vehicle, Allen collected Knight-Walker's driver's license and returned to his patrol car to run her information, discovering that her license was also suspended. Allen kept Knight-Walker's license in his car, returned to Knight-Walker's door, and informed her that her license was suspended, that she had received notice, and that she could not drive the vehicle away from the stop. Once it was determined that Knight-Walker's passenger was also unable to drive the vehicle and that Allen was not going to arrest Knight-Walker even though it was her third offense for driving on a suspended license, Knight-Walker stated that she would call her son to come get them. Allen failed to return Knight-Walker's license to her as it remained in his patrol car. When Knight-Walker pulled out her cell phone to contact her son, Allen began inquiring about whether there were guns or drugs in the vehicle.[3]

As the Supreme Court of the United States articulated in *Rodriguez v. United States*, 575 U.S. 348 (2015), "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve

---

[3] Once Knight-Walker got out of the vehicle, Allen asked the other officer on scene to have the passenger get out of the vehicle as well and asked Knight-Walker if he could pat her down before commencing his search of the vehicle, further delaying the completion of the traffic stop.

checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 349. Therefore, "[t]he critical question is not whether the [officer's unrelated investigative inquiry] occurs before or after the officer issues a ticket, but whether [that unrelated investigative questioning] adds time to the stop." *Id.*

Here, the traffic mission for which Allen stopped Knight-Walker was to determine whether the driver of the vehicle was in violation of Code § 46.2-301 by driving while her license to drive was suspended. Having determined that Knight-Walker was driving on a suspended license but that he was not going to arrest her for it and informing her that despite that decision she *could not* drive that night, Allen did agree to allow Knight-Walker to arrange for a means of leaving the stop legally. Allen's statement that Knight-Walker could not drive the vehicle that night, but that he was not going to arrest her for the offense of driving with a suspended license was a warning, concluded the mission of the traffic stop.[4] In order to facilitate her departure from the scene, Knight-Walker, with her cell phone in hand, was in the process of arranging for her son to come and pick her up but was interrupted when Allen began asking if there were drugs in the vehicle and seeking permission to search the vehicle. Following the Supreme Court's logic in *Caballes* and *Rodriguez*, absent reasonable articulable suspicion of other criminal activity, any amount of time extending the traffic stop beyond this point through Allen's unrelated investigative questioning impermissibly extended the stop.

---

[4] Although no summons appears in the record before this Court, there is some indication that Allen ultimately issued Knight-Walker a traffic summons for driving on a suspended license, third offense. Nevertheless, the process was interrupted and extended by Allen's new line of inquiry regarding drugs.

- 7 -

A police officer "*may* conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual," even if the delay is "de minimis." *Matthews v. Commonwealth*, 65 Va. App. 334, 344-45 (2015) (emphasis added) (quoting *Rodriguez*, 575 U.S. at 355). In *Matthews*, the responding officer exceeded the time reasonably necessary to address the traffic violation by asking various questions of Matthews not related to the traffic violation and requesting a K-9 unit to conduct a dog sniff of Matthews's vehicle. Neither activity could be supported by independent reasonable suspicion or probable cause. *Id.* Here, Allen exceeded the bounds of the traffic stop by beginning a line of investigation into the presence of guns or drugs in the vehicle without any indication from Allen or the second officer that there was any reasonable articulable suspicion whatsoever of whether there were any guns or drugs in the vehicle that would justify further detention of Knight-Walker.[5] Further, Allen had already allowed Knight-Walker and her passenger to search and rummage through the vehicle when they were initially trying to locate her license and the vehicle's registration without any apparent concern for officer safety as they did so. Allen even stated that while he could arrest Knight-Walker for driving on a suspended license because it was her third offense, he was not going to arrest her because she had been "nice" during their encounter. He merely warned her

---

[5] We note, however, that the typical questions an officer asks related to the initial inquiry of a traffic stop including but not limited to asking where the driver is traveling to or from; how their day or night is going; or even if they know why they were stopped by the officer are not implicated here. We also note that questions concerning officer safety, such as "are there any weapons in the car?," are not implicated here. We only address those questions which initiate a new line of investigation separate from the original traffic offense and which subsequently prolong the stop beyond the investigation of the traffic infraction, unless a reasonable articulable suspicion develops, necessitating further investigation—not questions related to securing the scene for the purposes of officer safety. Furthermore, we certainly do not adopt a per se rule that any delay by an officer would unconstitutionally extend a traffic stop, but rather address *only* the specific factual circumstances of the case presently before us.

that she could not continue driving because her license was suspended.[6]  The record does not reflect any indication from either Allen or the second officer that Knight-Walker's behavior during the stop gave rise to the additional reasonable suspicion necessary to justify prolonging the stop to search the vehicle for drugs, nor does the Commonwealth argue such justification. Therefore, given the specific facts of this particular case, we hold that Allen impermissibly exceeded the bounds of the traffic mission for which he stopped Knight-Walker when he then initiated an unrelated additional investigation without the needed reasonable articulable suspicion to justify additional detention and search of Knight-Walker's vehicle and subsequently delayed the completion of the next "task" tied to the traffic stop, namely allowing Knight-Walker to "get somebody here and drive the car away" as articulated by the trial court.

Relevant to this appeal, the following timeline of events occurred:

- Early in the traffic stop, as Knight-Walker and her passenger were looking through her bag, her pockets, and the vehicle for her driver's license, Allen asked Knight-Walker if there were any weapons in the car, to which Knight-Walker said "No;"

- Allen later informed Knight-Walker that her driver's license was suspended and that she could not drive the car, asking if the passenger could drive the car away from the scene;

- When the passenger said he could not drive either, Knight-Walker then stated that she could call her son, and Allen responded "Okay, yeah, just call somebody to come pick you up;"

- Allen assured Knight-Walker that he was not going to arrest her but reiterated that she could not drive the car, prompting Knight-Walker to again say "Okay, I'll call my son;"

- Knight-Walker picked up her cell phone to make the call, but before she could even attempt to make a call, Allen interrupted by saying "Okay, I know I asked you [inaudible]—I'll make

---

[6] It is also worth noting that because Knight-Walker pulled into a CVS parking lot and the vehicle was subsequently parked there for the duration for the stop, it was not a danger to other motorists.  Therefore, the vehicle did not need to be towed and Allen's search could not be justified as an inventory search pursuant to having the vehicle towed away from the stop.

sure we're on the same page here. No weapons in the vehicle? Do you have any drugs in the [inaudible] of the car?"

- Knight-Walker again replied "No, I do not," but Allen continued his investigation, asking specifically "No marijuana, no cocaine, no heroin, nothing crazy?"

- Knight-Walker, with her cell phone still in her hand still waiting to make a call, replied "No. No marijuana, no cocaine, no illegal substances;"

- Allen then responded "Okay. Do you mind if I check?" causing Knight-Walker to pause, grab the back of her neck and say "Umm," before Allen interjected "it would be real quick. I just want to make sure nothing's in the car."

- Knight-Walker, without saying anything else, got out of the car holding her bag and her cell phone.

In short, Allen's actions were impermissible under the particular facts of this case because he had already informed Knight-Walker that she was not going to be arrested and that she would need to have someone pick her up. Nevertheless, before she could commence her call, he repeated his request to search the vehicle and subsequently did so.[7] These repeated inquiries regarding contraband in the vehicle and the request to search the vehicle, coupled with the subsequent pat-down frisk and the search of the vehicle—all of which prevented Knight-Walker from calling her son and which were done without reasonable articulable suspicion—impermissibly prolonged the initial traffic investigation beyond what is articulated by the United States Supreme Court in *Rodriguez*. Knight-Walker consistently responded "No" to Allen's increasingly specific questions about whether there were guns or drugs in the vehicle, and Allen did not indicate any concerns for officer safety given that he allowed both Knight-Walker and her passenger to rummage through the car in search of her license and the vehicle's registration.

---

[7] The search of the vehicle occurred only *after* Allen asked to and conducted a pat down of Knight-Walker once she got out of the car. The search here was not supported by reasonable articulable suspicion and was entirely separate from his initially lawful detention of Knight-Walker to investigate a suspected traffic offense.

These investigatory inquiries unnecessarily delayed the completion of the traffic stop. Allen did

so in order to search the vehicle for drugs or weapons without any reasonable articulable

suspicion of either. There was every indication that Allen was basically finished with the stop,

except for returning Knight-Walker's license, and delayed her ability to "get somebody here and

drive the car away" by repeatedly asking her whether he could just go ahead and search her

vehicle "real quick"—even though there was no reasonable articulable suspicion of any

contraband in the car.[8] Knight-Walker could have contacted her son and he could have been on

the way but for these repeated requests to search. Therefore, the search itself delayed the phone

call and also delayed the completion of the traffic stop.

### B. Knight-Walker's Free and Voluntary Consent

"Consent loses its validity only if it is involuntary or, [is] the product of a manipulative

'exploitation' by the police of an earlier unconstitutional search or seizure." *Kyer v.*

*Commonwealth*, 45 Va. App. 473, 483 (2005) (citations omitted). Because Allen impermissibly

exceeded the bounds of the stop, he unlawfully detained Knight-Walker and thus

unconstitutionally infringed upon an area protected by the Fourth Amendment when he searched

Knight-Walker's vehicle. Consequently, Knight-Walker's consent to the search of her vehicle or

person was "tainted by the illegality and was ineffective to justify the search." *Florida v. Royer*,

460 U.S. 491, 507-08 (1983). Allen's repeated questions about the presence of drugs in the

vehicle and his insistence that a search would be "real quick," delaying Knight-Walker from

contacting her son and impermissibly extending the amount of time necessary to complete the

traffic stop, invalidated any consent Knight-Walker gave Allen to search the vehicle. Because

---

[8] Under our analysis, we acknowledge that had Allen initiated the new line of inquiry *after* Knight-Walker called her son and while both Knight-Walker and Allen were waiting for the son to arrive, the evidence seized as a result of the search would not be excluded. However, it is Allen's interruption of Knight-Walker's ability to "get someone here and drive the car" and impermissibly extend this encounter that constitutes a violation of the Fourth Amendment.

whatever subsequent consent Knight-Walker may have given was tainted by the illegality, it was invalidated and we need not address this assignment of error further.  Therefore, we find that the trial court erred when it denied Knight-Walker's motion to suppress the evidence seized as a result of that search.

## III.  CONCLUSION

For the foregoing reasons, given the specific facts of this particular case, we reverse the decision of the trial court denying the motion to suppress, and we remand to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*

Lorish, J., dissenting.

Knight-Walker argues that "Officer Allen impermissibly exceeded the bounds of the traffic mission for which he had stopped Ms. Knight-Walker's vehicle," and so the evidence he uncovered—after she consented to a search—must be suppressed. This is not because Officer Allen did not have cause to pull her over in the first place (she agrees he did), or because the mission of the traffic stop had ended (she agrees it had not). Knight-Walker argued below, and continues to argue on appeal, that the stop was ongoing when Officer Allen asked her whether there were any guns or drugs in her car.[9] Instead, Knight-Walker argues that her stop was unlawfully *extended* by "two questions spanning approximately twelve-seconds" of unrelated questions. This is because, as Knight-Walker readily concedes, "Officer Allen had not yet returned Knight-Walker's identification card or issued her a warning or traffic summons with regard to her offenses" at the time he asked her those questions.

Knight-Walker relies on *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), for the premise that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Based on this, Knight-Walker argues that if an officer asks *any* unrelated question during a traffic stop, (1) it is a per se violation of the Fourth Amendment, and (2) consent to search after that is fruit of the poisonous tree that must be remedied through the exclusionary rule. As Knight-Walker spelled out at oral argument, under this interpretation of *Rodriguez*, any unrelated question an officer may ask, including "Where are you traveling today?," "Where are you coming from?," and "Any fun plans this weekend?," all illegally extend a traffic stop. According to Knight-Walker, an

---

[9] While my colleagues in the majority dance around this question, in one place finding the traffic stop was already concluded by the time the unrelated questioning occurred, in another describing the stop as "basically finished," and in another suggesting it was ongoing but "extended," Knight-Walker has never waffled.

- 13 -

officer must have reasonable articulable suspicion to support asking any of these questions, and without it, any after-discovered evidence must automatically be suppressed.[10]

Our caselaw says the opposite. We have long said that during a lawful stop, police may "obtain the registration for the vehicle and request the identities of its occupants," "seek radio dispatch confirmation of the information obtained from the vehicle occupants," *and* "ask questions unrelated to the traffic violation." *Thomas v. Commonwealth*, 57 Va. App. 267, 277 (2010). The uncontroversial premise that law enforcement officers may ask questions unrelated to the traffic stop is grounded in United States Supreme Court precedent. In *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), the Supreme Court held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."

Then came *Rodriguez*. To understand and apply *Rodriguez*, we must first step back to look at the exclusionary rule more generally. At core, the rule bars the government from introducing evidence that has been obtained through a violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). To be excluded, the evidence must have been "obtained as a product" of the illegal search or seizure. *Wood v. Commonwealth*, 27 Va. App. 21, 30-31 (1998); *United States v. Gray*, 491 F.3d 138, 154 (4th Cir. 2007) (explaining "[t]he threshold question is whether [the] evidence is the product of an illegal search"). If a

---

[10] My colleagues in the majority try to resist what Knight-Walker readily admits is required by her reading of *Rodriguez*. Without providing any reason why, the majority tries to exclude typical questions an officer asks such as "where the driver is traveling to or from," "how their day or night is going" and "are there any weapons in the car?" from the scope of its holding. But under the per se rule endorsed by the majority, delay is delay, and law enforcement officers should be on notice that delay from such questions (or even stopping to respond to a text message or listen to an unrelated APB) would all unconstitutionally extend a traffic stop under the majority's logic.

defendant is unlawfully detained, our Supreme Court has concluded that where consent to search was the "product[] of an illegal detention" evidence "obtained as a result of the illegal seizure should have been suppressed as the 'fruit' of an illegal seizure." *Harris v. Commonwealth*, 266 Va. 28, 34 (2003).[11]

Before *Rodriguez*, the federal circuit courts were split on whether the seizure for a traffic stop remained lawful if the activities related to the traffic stop had concluded, but the driver was held for only a small amount of extra time while waiting for a drug dog to arrive. *Rodriguez* gave a clear answer. 575 U.S. at 355. A lawful detention ends when the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* The traffic stop in *Rodriguez* had plainly ended. Yet the officer continued to hold Rodriguez on the scene for seven or eight more minutes so that a canine sniff could take place. The Court held that this additional detention was unjustified by the original mission of the stop, so the evidence obtained from that illegal detention had to be suppressed if no reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic stop. *Id.* at 357-58.

While the traffic stop in *Rodriguez* had actually ended before the canine sniff took place, the Supreme Court made clear that it would have been equally improper to extend a stop through a seven or eight minute detour earlier in the detention so that the drug dog would arrive before the stop was completed. For this reason, the "critical question" was "not whether the dog sniff occurs before or after the officer issues a ticket." *Id.* at 357. Expressed in visual form, in both situations, evidence discovered following a canine alert must be suppressed:

---

[11] Whether consent is the fruit of prior illegality is a separate question from whether consent was voluntary when given. As I take up later, "[w]hether a consent to a search was voluntary 'is a question of fact to be determined from the totality of all the circumstances.'" *Gray v. Commonwealth*, 233 Va. 313, 327 (1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). "The mere fact that a defendant is in custody is not enough in itself to demonstrate a coerced consent to search." *Id.*



If a driver is detained after the mission of the traffic stop is complete, that is an illegal seizure and any evidence obtained then is the product of that illegal seizure and must be suppressed. Likewise, when an officer delays the time it takes to reasonably complete a traffic stop through unrelated investigation (waiting for a drug dog or through unrelated questioning) such that evidence is obtained *after* the stop should have been complete, the evidence is also the product of an unlawfully extended detention and must be suppressed.

Our prior decision in *Matthews v. Commonwealth*, 65 Va. App. 334, 344-45 (2015), flows naturally from *Rodriguez*. In both cases, the mission of the traffic stop (and the detention authorized by the reasonable suspicion for that stop) was complete, law enforcement continued to detain the defendant anyway, and incriminating evidence was then uncovered. After the traffic stop was completed in *Matthews*, the officer "issued Matthews a warning for the dangling object and gave the learner's permit and ID back to Matthews," and then asked him to consent to a search.[12] *Id.* at 340. Matthews agreed. When Matthews sought to suppress this evidence as the product of an illegal detention, we agreed that Matthews was still seized when the officer

---

[12] Prior to this point, another officer had asked about Matthews's criminal history and tattoos, and also asked for consent to search. *Matthews*, 65 Va. App. at 345. *Matthews* suggested that these earlier questions had also "prolonged the stop." *Id.* But because even the "prolonged" traffic stop had unquestionably ended by the time the second officer confirmed with Matthews (still seized) that he would in fact consent to a search, we did not analyze the independent impact of the earlier questions.

continued to question him after the stop was over because a reasonable person would not have felt free to leave in that moment. *Id.* at 342. This extra detention was unlawful because it was not authorized by the original mission of the traffic stop, which was already completed.

Applying our Supreme Court's decision in *Harris*, this Court concluded that the evidence obtained following Matthews's consent was the fruit of the poisonous tree from the unlawful detention. *Id.* at 346 ("[P]ursuant to *Harris*," the consent given was irrelevant because "Matthews's detention exceeded the time reasonably necessary to address the dangling object traffic violation, the seizure violated the Fourth Amendment." (citing *Harris*, 266 Va. at 34)).[13] If a defendant is subject to an "illegal detention," "evidence obtained as a result of the illegal seizure" must be suppressed unless some exception to the exclusionary rule applies. *Harris*, 266 Va. at 34 (explaining and applying the "fruit of the position tree" doctrine from *Wong Sun*, 371 U.S. at 487-88).

Knight-Walker does not argue that the mission of the traffic stop should have ended before she consented to the search. Instead, Knight-Walker asks us to turn the explanation in *Rodriguez*—that an officer may not conduct "unrelated checks . . . in a way that prolongs the stop"—into a per se rule that any delay an officer adds to a stop necessarily makes the rest of the detention illegal. Therefore, any evidence uncovered after that point must be suppressed. My colleagues in the majority have adopted this view. But, as explained above, *Rodriguez* only requires exclusion if the evidence was discovered after the stop actually ended or should have ended. Only then, would the evidence be "fruit of the poisonous tree" from an illegal detention.

---

[13] The traffic stop at issue in *Matthews* occurred pre-*Rodriguez*. Accordingly, our Court found that while the product of the consent search would be inadmissible under a *Rodriguez* analysis, it was nonetheless admissible in Matthews' case because the officers had acted in good faith reliance on the law available at the time of the stop. *Id.* at 353.

The situation in Knight-Walker looks like this:



The mere fact that an officer asked unrelated questions (which necessarily takes some amount of time) does not mean that the entire rest of the detention is illegal. This is clear under *Rodriguez.* If an officer asks unrelated questions or undertakes other tasks that take a few minutes of time, but incriminating evidence is nevertheless found within the amount of time "tasks tied to the traffic infractions are—or reasonably should have been—completed," the detention has not been unlawfully extended. 575 U.S. at 355. Likewise, if consent occurs (or reasonable suspicion develops) during the time authorized by the original mission of the traffic stop there is no unlawful detention, so after-discovered evidence is the product of a lawful, not unlawful, seizure. But if the officer only obtained consent, or developed reasonable suspicion after the stop should have reasonably ended but for the delay, evidence discovered after that might have to be suppressed because the unlawfully prolonged detention tainted the consent or reasonable suspicion.

To illustrate the distinction in a different context, imagine an officer has reasonable suspicion that the driver of a car was just exceeding the speed limit. He pulls over the vehicle, approaches, and before he even introduces himself, he notices a novel in the front seat. If he

asks the driver if he likes the book, that question is clearly unrelated to the purpose of the traffic stop. And asking the question, and waiting for an answer, adds some measurable amount of time to the traffic stop beyond what a reasonable officer expeditiously completing the stop would have required. If the officer then sees a passenger in the backseat shift her foot to expose potential drug paraphernalia, giving her reasonable suspicion of drug activity, the evidence found from a resulting search would not need to be suppressed simply because unrelated questioning added some time to the stop. That is because the officer developed an independent basis to search the vehicle well within the time period during which "tasks tied to the traffic infraction . . . reasonably should have been" completed. *Rodriguez*, 575 U.S. at 355. Said another way, any incriminating evidence ultimately found would not be the product of the brief delay because, even without the questioning, the officer would have had cause to search within the time period authorized by the original stop.

An analogous situation occurred in a case from the Idaho Supreme Court where a traffic stop included 28 seconds of questioning and delay that was unrelated to the mission of the stop. *State v. Riley*, 514 P.3d 982 (Idaho 2022). Even so, the evidence found after a drug dog alerted on the car did not need to be suppressed because the alert came 48 seconds *before* the tasks related to the traffic stop were completed. *Id.* at 989. In other words, had the extra questioning not taken place, the drug dog still would have alerted within the period of detention authorized by the original purpose and mission of the traffic stop.

On the other hand, imagine that the same officer finished writing up a ticket for speeding, went back to the car with the ticket and license in hand, and only then engaged the driver over the novel in the front seat. Only after this exchange does the passenger in the backseat shift her foot to expose potential contraband. This would be a different case entirely. The factfinder would then have to scrutinize whether the traffic stop would have already ended before the foot

- 19 -

shift had the officer not pursued questions unrelated to the stop. If the stop would have ended, then the questioning prolonged the stop making the detention illegal by the time the officer developed reasonable suspicion to search the vehicle based on the foot shift.

This scenario is analogous to cases where an officer deliberately delays handling a traffic stop to buy time for a drug dog to arrive on the scene. For example, when "police body camera footage ma[d]e it clear that during" the execution of a traffic stop the officer's "supervisor instructed him to 'just hold off' and 'just wait for the K-9, he's on the way'" before completing the stop, and other evidence confirmed that the stop should have been completed before the drug dog arrived, suppression of the evidence was required. *United States v. Clark*, 2022 U.S. Dist. LEXIS 194538, at *18 (W.D. Va. Oct. 2022). That is because after the tasks related to the infraction should have been completed, the driver's detention was illegal. And evidence that was only uncovered because of an illegal detention must be suppressed. *Id.* at *17.

When the tasks related to a traffic stop should have been completed was a question for the factfinder. Here, Knight-Walker never argued that the mission of the traffic stop was complete before the 12 seconds of unrelated questioning took place, so the trial court never made a factual finding on this point. Likewise, Knight-Walker never argued that Officer Allen "interrupted" or delayed her ability to call her son for a ride. In fact, counsel at argument very respectfully "push[e]d back" on questions about the phone call and said, "It doesn't matter whether she called her son or not." Undeterred, the majority finds its own facts, and concludes that the mission of the traffic stop ended when Officer Allen "merely warned her that she should not continue driving because her license was suspended" and that "[t]here was every indication that Allen was basically finished with the stop, except for returning Knight-Walker's license" but then Officer Allen delayed her ability to "get somebody here and drive the car away" through his 12 seconds of questioning. In the light most favorable to the Commonwealth, the mission of the

traffic stop had not ended, because, as Knight-Walker has consistently argued, "Officer Allen had not yet returned [her] identification card or issued her a warning or traffic summons."

What is more, the majority concedes that "had Allen initiated the new line of inquiry *after* Knight-Walker called her son and while both Knight-Walker and Allen were waiting for the son to arrive, the evidence seized as a result of the search would not be excluded." But the majority fails to explain how the mission of the traffic stop could still be ongoing *after* the call was made while, at the same time, have already ended *before* the call was placed. Both cannot be true. Either Knight-Walker was free to walk away before the questioning took place and wait for a ride elsewhere, or she was not. Indeed, the majority's reasoning here mirrors the analysis the circuit court undertook (but which the majority purports to reject) in finding the mission of the traffic stop was ongoing because Knight-Walker could not drive away from the scene while her license was suspended).

As Knight-Walker's counsel suggested at oral argument, the phone call is a red herring. So is the question of whether the mission of the traffic stop was lawfully extended until Knight-Walker's ride arrived.[14] Knight-Walker's consent gave Officer Allen a basis to search her vehicle.[15] Knight-Walker argues that this evidence following this consent search must be suppressed because Officer Allen asked her 12 seconds of unrelated questions. But, as explained above, *Rodriguez* does not impose this per se rule. Instead, the question under *Rodriguez* is

---

[14] In essence, I find the court was right for a different, simpler reason. Under the right result different reason principle, an appellate court does not hesitate to sustain the result on an alternative ground where the correct conclusion has been reached. *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020). As such, I "express no view on the correctness of the lower court's rationale." *Rickman v. Commonwealth*, 294 Va. 534, 542 (2017).

[15] On this point, the majority again expands Knight-Walker's argument by suggesting that "the search itself . . . delayed the completion of the traffic stop." I respectfully disagree that the time it took to complete the search is relevant as the search was authorized by Knight-Walker's consent. The only question (the one raised by Knight-Walker) is whether the questioning *before* that consent improperly extended the stop.

whether Knight-Walker consented after the traffic stop was, or should have been, complete. The answer is no. Knight-Walker consented to the search well within the amount of time "tasks tied to the traffic infractions [were]—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 355.

Adopting Knight-Walker's concession that the unrelated questioning included "two questions spanning approximately twelve-seconds" and that the mission of the traffic stop had not ended when that questioning occurred, nothing in the record suggests the traffic stop would have ended 12 seconds later but for Officer Allen asking those two questions.[16] Thus, Knight-Walker provided consent to search while she was still lawfully detained for the original traffic stop. That also means the evidence uncovered here was not the *product* of the alleged constitutional violation. It was the product of Knight-Walker's consent that occurred during the seizure authorized by the mission of the original traffic stop.

The more difficult question is whether Knight-Walker voluntarily consented to the search. Consent to a search "must be unequivocal, specific, and intelligently given . . . and it is not lightly to be inferred." *Hawkins v. Commonwealth*, 65 Va. App. 101, 107 (2015) (alteration in original) (quoting *Elliott v. Commonwealth*, 7 Va. App. 234, 239 (1988)). Under the circumstances, while detained in the middle of an ongoing traffic stop, when Knight-Walker had no license and could not drive away, it is a real question whether Knight-Walker freely and voluntarily consented to the search by hesitantly getting out of the vehicle. Yet it is a question for a factfinder, and here, the factfinder concluded that she consented based on her conduct of

---

[16] The body camera footage shows that it took Officer Allen ten seconds just to walk from his police car to Knight-Walker's car. In other words, assuming Officer Allen never engaged in 12 seconds of unrelated investigation, it would have taken him more than 12 seconds to walk back to his car, write out the summons, and return to Knight-Walker's car with license and summons in hand. Knight-Walker never argued below, and no evidence suggests, that Officer Allen deliberately delayed in executing this traffic stop in any way.

getting out of the vehicle so the search could take place. *See Bynum v. Commonwealth,* 23 Va. App. 412, 418 (1996) (noting that courts have found consent from "conduct alone"); *see also Gray v. Commonwealth*, 233 Va. 313, 327 (1987) ("The mere fact that a defendant is in custody is not enough in itself to demonstrate a coerced consent to search."). Since that finding of fact is not "plainly wrong" or without evidentiary support, this Court is bound by it on appeal. *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc).

In conclusion, I must dissent in this case—not because I think the vast expansion of brief detentions following *Terry v. Ohio*, 392 U.S. 1 (1968), is logically consistent with the Fourth Amendment—but because I am bound by *Johnson* and *Rodriguez*, and my colleagues misapply these cases here. Under *Rodriguez*, if an officer asks unrelated questions or undertakes other unnecessary tasks during a traffic stop but incriminating evidence is found within the amount of time "tasks tied to the traffic infractions are—or reasonably should have been—completed," the detention has not been unlawfully extended and evidence discovered during the authorized period of detention need not be suppressed. 575 U.S. at 355. If, however, the officer only obtains consent, or develops reasonable suspicion after the stop should have reasonably ended absent the delay, after-discovered evidence would have to be suppressed. This case falls in the first category.